1                   UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF FLORIDA

3                   CASE NO. 09-20138-CR-HUCK

4    UNITED STATES OF AMERICA

5           vs.

6    CARLOS GARRIDO

7    GONZALO NODARSE

8    ALEXIS CARRAZANA

9    ALEXIS DAGNESSES,

10                  Defendants

11          SENTENCING HELD 6-5-09

12              BEFORE THE HONORABLE PAUL C. HUCK

13              UNITED STATES DISTRICT COURT

14   APPEARANCES:

15   FOR THE GOVERNMENT:       JOHN NEAL,

16                            ASSISTANT UNITED STATES ATTORNEY

17   FOR DEFENDANTS:           BERNARD CASSIDY, ESQUIRE

18                            CARL KAFKA, ESQUIRE

19                            SABRINA PUGLISI, ESQUIRE

20                            HOWARD SCHUMACHER, ESQUIRE

21   REPORTED BY:              PATRICIA SANDERS, RPR

22                            Official Court Reporter

23

24

25

1              THE COURT:  We're here in the matter of United States

2    versus Garrido, Nodarse, Carrazana and Dagnesses may have I

3    appearances of counsel, please.

4              MR. NEAL   John Neal on behalf of the United States. With me

5    at counsel table is Agent Manuel Hernandez, the case agent on the

6    case.

7              MR. CASSIDY:  Bernard Cassidy on behalf of Mr. Garrido.

8              MR. KAFKA:  Carl Kafka on behalf of Mr. Nodarse who is

9    present next to me.

10             MS. PUGLISI: Sabrina Puglisi on behalf of Alexis Carrazana

11   who is present before the Court.

12             MR. SCHUMACHER:  Good morning.  Howard Schumacher on behalf

13   of Alexis Dagnesses who is present.

14             THE COURT:  Please be seated.  I want to talk about one

15   preliminary matter that I think may relate to all defendants. I note

16   there is a recommendation for some defendants that there be a two

17   level increase pursuant to 2B1.1(b)(13)(A).

18             That is a conscious or reckless disregard for the risk of

19   death or serious injury to a victim or victims.  I note the

20   Government has argued against the application of that provision with

21   regard to one or more defendants and for the application with one or

22   more defendants.

23             I am kind of curious as to why the Government has taken

24   that view. For example, with regard to Nodarse they have objected to

25   that enhancement. With regard to Carranza they have objected -- or

1    supported it.

2         MR. NEAL  that's correct, Your Honor.  The distinction is

3    the Government entered into plea agreements with Mr. Nodarse as well

4    as Dr. Garrido. These plea agreements were the result of

5    negotiations and in those plea agreements both Mr. Nodarse and Dr.

6    Garrido agreed to waive certain valuable rights, such as the right

7    to appeal.

8         They agreed to not contest the guideline calculation that

9    was included within the plea agreement. They agreed not to seek a

10   variance or downward departure as to any enhancements that were

11   included in the plea agreement.

12        So on the basis of that the Government in the negotiation

13   process did not seek all of the enhancements that might have applied

14        With regard to Mr. Carrazana and Mr. Dagnesses, both of

15   those defendants pled straight to the indictment without plea

16   agreements. They are free to appeal any sentence imposed here today.

17   They are certainly free to argue for a downward departure if they so

18   choose.

19        On the basis of that the Government feels obligated to seek

20   all sentencing enhancements that may factually apply.

21        THE COURT:  I appreciate that explanation because it seemed

22   kind of inconsistent.  I could see how that could apply in this

23   case, the enhancement.  I have to admit I am not a doctor or a

24   medical professional. I did read the materials that were submitted.

25   I think there are some potentially negative side effects of the

1   application of some of these -- what you call I guess enhanced

2   blood.  That's what it is really, just modified blood. But I am not

3   sure that's the kind of risk of serious bodily injury that is

4   considered under the guidelines.

5          So I am not going to apply that with regard to anyone.

6   Plus the idea that it is going to be applied -- while I understand

7   your rationale because of your negotiations -- I think it would be

8   inappropriate to apply it to some and not others.  So I am going to

9   remove the two level enhancement as to all defendants.

10          However, I will say this, that while I am not going to

11   enhance or allow the two level enhancement I am going to take that

12   into consideration under the statutory factors, Section 3553, the

13   fact that part of the scheme was to give unneeded medication to the

14   patients and that this unneeded medication has the potential for

15   some harmful effects.

16          It represents, in my view, kind of a disregard for the well

17   being of others. But I do not think it rises to the level

18   contemplated by 2B1.1(b)(13)(A).

19          But I do think it is a factor, particularly when you have

20   the type of patients you have here, those that are afflicted by HIV,

21   which makes them particularly susceptible to medical problems.

22          It's also my understanding a full dosage of drugs was not

23   generally applied or given in this case.  That being the case, I

24   would assume that the risk would be lessened than if it was the full

25   dosage. Of course that's part of the problem with the whole scheme,

1  they were given to people that did not need it and also not given

2  full applications. So let's take one at a time.  Let's start with

3  Mr. Nodarse.  Where does that leave us?

4       Mr. Felasco.

5       MR. FELASCO:  Mr. Nodarse right now has a total offense

6  level of 29.

7       THE COURT:  So it would be 27 now?

8       MR. FELASCO:  Level 27 now.  Guideline imprisonment range

9  would become 70 to 87 months.

10      THE COURT:  All right.  Defendant objects saying that there

11 was no special skill applied therefore that does not apply. So let

12 me hear about that.

13      MR. KAFKA:  Good morning, Your Honor, Carl Kafka on his

14 behalf.  When you addressed the initial issue of the previous

15 enhancement, within days of Mr. Nodarse's arrest I on his behalf

16 contacted Mr. Neal and began negotiations, the resolution of the

17 case.

18      We agreed on what was presented to the Court in the plea

19 agreement, that the Government was not going to seek an enhancement

20 or this particular enhancement.

21      We agreed to the enhancement of sophistication of the

22 offense. We agreed on the guidelines. By my objection, I believe the

23 Government's objection to the inclusion of the enhancement, we are

24 both asking the Court not to include it.  My client was a medical

25 assistant. He was not a doctor.

1        As a medical assistant he does not need the licensing that

2   I believe the application notes refer to when they say you needed

3   extensive training and education. He was basically working as a

4   medical assistant aiding the doctors in basically running the

5   clinic. And as such I do not think this enhancement would apply.

6        THE COURT:  Mr. Neal.

7        MR. NEAL: We are not seeking the enhancement because it was

8   not included in the negotiated plea agreement.

9        THE COURT:  Well, it seems to me as a physician's assistant

10  he did have special skills that were applied in this case.  And of

11  course I am not bound by the agreement of the parties.  He is

12  certified as a phlebotomy technician.  He has a certificate.

13       MR. KAFKA:  In my objections I quoted the United States

14  Department of Labor where it actually makes a distinction between

15  the two.  As a physician's assistant there is quite a bit of

16  training.  And my client is not at all a physician's assistant.  He

17  is just a medical assistant.  And it is basically getting a license

18  as a medical assistant.

19       And as you can see from the distinction that the Department

20  of Labor gives, a medical assistant is basically helping in the

21  operation of a clinic.

22       A physician assistant on the other hand works hand-in-hand

23  with the doctor. In fact, works hand-in-hand with the actual

24  payment. I submit to the Court as a medical assistant he does not

25  have the special skill that I believe the guidelines talk about.

1          THE COURT:  He has a number of certificates.  He is a

2    phlebotomist.  He is a registered chiropractic assistant.  He has a

3    registered medical assistant certificate.

4          He has a certified phlebotomy technician certificate.  He

5    has a registered chiropractic assistant certificate and license.  He

6    has had medical studies in Cuba.  Apparently he did not get a M.D.

7    or whatever.

8          He has passed his examination.  He has been a registered

9    nurse. I am trying to find exactly what he was doing. He was

10   administering the drugs; was he not?  I thought he was actually

11   administering the drugs.

12         MR. NEAL: He was involved in the administration of the

13   medication, Your Honor.

14         MR. KAFKA:  My understanding is his involvement was the

15   day-to-day operation with the doctors of the clinic and when the

16   other phlebotomists were not at the clinic that my client would

17   sometimes aid in the giving of the medicine.

18         It was not like he was doing that full-time. He was working

19   in part with the doctors and owners of the clinic.  But there were

20   two other clinics that he also participated in. So he was going in

21   and out of this particular clinic.  I do not think he was a full

22   time phlebotomist.

23         THE COURT:  He was doing what a phlebotomist does and was

24   using his skills to perpetrate a fraud not only on the Medicare

25   system and the patients -- or maybe not the patients.  Maybe they

 1   were fully aware of it.  I think he does qualify.  I am going to

 2   overrule that objection in spite of the Government not having it in

 3   the plea agreement.  I think it's clearly established here.

 4        MR. KAFKA:  In terms of a procedural -- once I file my

 5   objection I believe the Government has the burden of showing that.

 6   I don't think the Government, based on the agreement, would be in a

 7   position to do that. It would be a violation of the agreement.

 8        THE COURT:  Well, the Government is not promoting this.

 9        MR. KAFKA:  That's correct.

10        THE COURT:  The Government has done just the opposite. But

11   I am not bound by that agreement. I am looking at the presentence

12   report. Based on the facts in the presentence report I believe that

13   your client did have special skills which he utilized in

14   perpetrating the fraud.

15        And the record should reflect the Government has not

16   supported it. They have taken the opposite position, that they're

17   not supporting the enhancement.  It's Probation's position that it

18   applies, and I agree with Probation. That leaves us at a 70 to 87

19   advisory guideline recommendation.

20        There was apparently a forfeiture amount.  That has been

21   resolved, correct?  That was originally an objection --

22        MR. NEAL: Yes, Your Honor. We have a consent to forfeiture

23   that we will tender to the Court.

24        THE COURT:  Then there was an objection to the statutory

25   maximum, and that's been resolved.

1              MR. KAFKA:  Yes, Your Honor.

2              THE COURT:  For the record, have all counsel discussed with

3    their clients the presentence report for their client and the fact

4    they have a right to object?  Have you all done that?

5              MR. CASSIDY:  Yes, Your Honor.

6              MR. KAFKA:  Yes, Your Honor.

7              MS. PUGLISI:  Yes, Your Honor.

8              MR. SCHUMACHER:  Yes, Judge, I have.

9              THE COURT:  Is there any other matter I should take into

10   account with regard to Mr. Nodarse?

11             MR. KAFKA:  No, Your Honor.

12             THE COURT:  All right.  That takes us to Carrazana.

13             MS. PUGLISI:  Yes, Your Honor.

14             THE COURT:  Here I have taken care of one of the

15   objections, that is the risk of death or serious bodily injury.

16             MS. PUGLISI:  Yes.

17             THE COURT:  I have read the numerous letters --

18             MS. PUGLISI:  Thank you, Your Honor.

19             THE COURT:  Mr. Carrazana was a 29 but is now down to 27

20   with an advisory guideline range of 70 to 87 months.

21             MR. NEAL: Yes, Your Honor.

22             MS. PUGLISI:  Yes, Your Honor.

23             THE COURT:  We have some additional objections.

24             MS. PUGLISI:  Your Honor, if I may also, I had a typo with

25   respect to paragraphs 12, 15, 17 and 18.  I refer to the offense

 1    conduct and relevant foreseeable conduct and I stated 3B1.3.  The

 2    actual guideline section is 1B1.3.

 3            THE COURT:  Well, I am going to overrule the objection with

 4    regard to those paragraphs 12, 15, 17, 18, 20 and 26.  This is just

 5    general background.  It's not affecting his advisory guideline

 6    range, nor will it affect his sentence.  It's part and parcel of the

 7    overall criminal scheme.

 8            I do note there's been an adjustment with regard to the

 9    potential loss.  It is now below 7,000,000.  I think it was 40,000

10    over 7,000,000 but now it's less than 7,000,000.

11            MR. NEAL  Yes, Your Honor.  The issue there is if Mr.

12    Carrazana is found to have withdrawn from the conspiracy February

13    2004 then the loss amount would be below 7,000,000 --

14            THE COURT:  Oh, if he is found --

15            MR. NEAL:  If he is found.  Our position is he did not

16    withdraw.

17            THE COURT:  I misunderstood then. Let's talk about that. He

18    worked for a period of time and no longer worked, but how is it that

19    he withdrew?

20            MS. PUGLISI:  Judge, the cases in the Eleventh Circuit,

21    which I cited in my pleadings, there are two prongs, and I believe

22    there may be some confusion as to how those prongs affect the facts

23    in this case.

24            The first prong is affirmative steps inconsistent with the

25    objectives of the conspiracy to disavow or defeat the objectives of

1    the conspiracy. Now, both Probation and the Government talk about

2    defeating the objectives of the conspiracy.  That may or may not

3    have been the case here. But specifically the word disavow, because

4    it's an or in that prong, disavow means, according to Websters

5    dictionary --

6         THE COURT:  Well let me tell you what it means to me and

7    that is what the Eleventh Circuit says it means.

8         Is there any case that says if someone stops being involved

9    that either is a disavowment or stepping away from the conspiracy?

10        MS. PUGLISI:  I do not believe there are any cases that

11   specifically talk about cases like this. I did the research and I

12   was not able to find anything.

13        THE COURT:  I know of none. Seems to me the Eleventh

14   Circuit requires more than just terminating one's act of

15   participation in the conspiracy.

16        MS. PUGLISI:  I agree, and I think it has to be that you

17   reject the conspiracy. I have to note -- one thing I did not put in

18   my pleadings is the fact Mr. Carrazana quit this job for no other

19   employment.

20        He came to this country in 1996 and always had a job.

21   Instead of leaving this job because he found something else he ended

22   up being unemployed for ten months because he could not find another

23   job.  Specifically the reason he did that is because he no longer

24   wanted to continue participating in this conspiracy. He rejected

25   this and had no further contact with them.  That goes to what the

1    Eleventh Circuit cases say, which is he disavowed and made a

2    reasonable effort to communicate those acts to his co-conspirators

3    by having no further activity and saying, I am quitting, I don't

4    want to be involved here anymore.

5            THE COURT:  Okay.

6            MR. NEAL:  I think what counsel has described is mere

7    cessation of activity in the conspiracy.  He stopped working there.

8    He had no further contact with the members of conspiracy.

9            However, to prove withdrawal from the conspiracy a

10   defendant must have taken steps to defeat the objects of the

11   conspiracy and, second, they either communicated that -- those

12   efforts to the other members of the conspiracy or reported the

13   scheme to law enforcement. He did neither.  All he did was stop

14   working there and stopped actively participating in the conspiracy.

15           THE COURT:  I agree with the Government's position.  I

16   don't think we have enough here to show that he had actually

17   withdrawn from the conspiracy. So I am going to deny the objection.

18   That would leave us at 27 at this point.

19           MR. NEAL: That's correct.

20           THE COURT:  But if you would remind me of that at the time

21   of sentencing because that is something I will take into

22   consideration under 3553.

23           All right.  We have a minor role objection.  That would be

24   your burden.

25           MS. PUGLISI:  Judge, I would stand by the pleadings, what I

1   put within the pleadings. I just want to add a few things. One of

2   the things I think is important to remember, because there's no

3   question -- obviously the Government in their response talks about

4   the fact that he was giving these injections and falsifying the

5   medical records.

6        Obviously he would not have pled guilty and accepted

7   responsibility had he not done that.  What I think is important is

8   all of this was at the direction of the owner and the doctors.

9        Mr. Carrazana never took any initiative to change these

10  records or to give altered amounts of the medication. It was always

11  that the owner would come to him and say you need to change this on

12  the record. You need to do a new record or you are giving too much

13  medication.

14       It's because of that that we would say, Judge, that he had

15  a minor role.  He was not involved in any of the billing.  He had no

16  knowledge as to what was being billed. He was an employee working at

17  the direction of others, and was afraid he would lose his job.

18       THE COURT:  Let me stop you.  Yes, he is less culpable than

19  some of these people. Some of these people are going to get enhanced

20  roles.  I do not think his role is less than some of the other

21  people we're dealing with.  Certainly it is more than the

22  "patients".

23       I don't see the basis for a role reduction. He was playing

24  an integral role. Granted he is not a manager or supervisor. He was

25  not a doctor.  But he was performing a very substantial part of this

1    conspiracy. I am going to deny the motion for minor role. You also

2    have a sophisticated means argument.

3         MS. PUGLISI:  With respect to sophisticated means I will

4    just rest on the pleadings.

5         THE COURT:  I will deny that as well. Whether he himself

6    was sophisticated and used those sophisticated means, certainly the

7    conspiracy clearly qualifies.

8         Are there any other objections?

9         MS. PUGLISI:  I believe that's all. There were a couple of

10   minor changes, however, the Government did not disagree with

11   paragraphs 61 and 71 so that changes.

12        THE COURT:  All right.  So we're still at 27, 70 to 87

13   months.  Let's go on to Mr. Dagnesses.  Here we have a total offense

14   level 31, criminal history of one. That's true of all the

15   defendants, criminal history one.  The starting point of 31 gives us

16   an advisory guideline range of 108 to 135 months --

17        MR. SCHUMACHER:  Actually with the two points the Court has

18   taken off --

19        THE COURT:  I want to start from one place and work our way

20   down. So we start with the 21.  That's 108 to 135.

21        MR. SCHUMACHER:  Yes, Your Honor.

22        THE COURT:  He did not object, but as I said, for all

23   defendants I am not finding a risk of serious injury or death.  So

24   that takes him to 29, which that is 87 to 108.  He objected to

25   sophisticated means so let's talk about that.

1          MR. SCHUMACHER:  I know that the Court has previously ruled

2    on Mr. Kafka's client as relates to this particular issue, but I

3    would like to ask the Court to view this with an open mind --

4          THE COURT:  I always try to view these things with an open

5    mind.  That's not a good predicate to start with.

6          MR. SCHUMACHER:  Your Honor, the reason I say that is

7    because I think there was something that was overlooked. And that is

8    application note two -- actually Section Two of the use of special

9    skill under 3B1.3.

10         It indicates that, the fact that a licensed professional

11   commits a crime does not justify an enhancement if the defendant did

12   not employ his special skills to facilitate the commission of the

13   offense.

14         The reason I think that is pertinent is because the Court

15   as related to Mr. Kafka's client indicated that he had several

16   certifications.

17         I think what this particular note suggests is the knowledge

18   that the person has or the training that the person has, has to

19   translate into facilitating and creating a greater likelihood of

20   success in what he is doing to further the aim of the conspiracy.

21         And what I pointed out in my objections is we have two

22   instances in this case where that just was not the case. I am

23   talking about the individuals that did what Mr. Dagnesses did, which

24   predated his entry into the conspiracy, a person by the name of

25   Pucha, and then an individual subsequent or ante-dating his -- after

1    he no longer participated in the event.  A woman that actually came

2    in and took his place by the name of Jackie or Jacqueline. The first

3    person Pucha was actually a jeweler by trade but she had educated

4    herself to a sufficient level to be able to manipulate the blood

5    results.

6            And that is either through spinning, using a centrifuge or

7    some other chemical manipulation of removal of the platelets. Mr.

8    Dagnesses was then taken out of Midway, T&R and Diagnostic by the

9    person that ante-dated him, which was the lady by the name of

10   Jacqueline.

11           This is a woman that was originally hired to do paperwork

12   and to assist as a physician's assistant. What she did is -- she

13   essentially had no formal training, but it simply was educating

14   someone that you needed to manipulate the blood, that you needed to

15   spin the blood.

16           The fact that Mr. Dagnesses was a trained physician in

17   Cuba.  And one of the other cases I suggested and put in my

18   objections is that what the guidelines talk about is that the

19   training, his specialized training, has to somehow or another equate

20   to the evil --

21           THE COURT:  Let me ask you this.  The Government says that

22   Mr. Dagnesses manipulated the blood samples by extracting the

23   platelet rich plasma from the blood.  And the Government takes the

24   position that is a special skill. Is it your view that is not a

25   special skill?

1        MR. SCHUMACHER:  No, Judge. In light of the people, again,

2   that were used in the exact same means of conspiracy before and

3   after him. These were people that did not have the level of training

4   that he had --

5        THE COURT:  Do members of the general public have that

6   skill?

7        MR. SCHUMACHER:  Absolutely.

8        THE COURT:  They do?

9        MR. SCHUMACHER:  One lady was a jeweler --

10       THE COURT:  I don't know what her background -- you can get

11  on the job training.

12       MR. SCHUMACHER:  I agree. Sometimes on the job training can

13  rise to the level or self taught measures can rise to the level.  I

14  agree that's what the guidelines say.

15       We have people in this case that pretty much all along the

16  timeline of the conspiracy are doing exactly what Mr. Dagnesses did,

17  but it was not something that he is using as a physician, as a

18  trained physician in Cuba, to facilitate that.

19       THE COURT:  But he was using it here. He was using his

20  skills. I could not do it.  Seems to me it's a technical skill that

21  is generally not acquired by the public.

22       Whether you need to be a doctor, a phlebotomist or a

23  medical technician or whatever or whether you do it because you go

24  to a lab that is a fraudulent lab, such as this one, and you are

25  taught there how to do it, seems to me that is a special skill.

1          MR. SCHUMACHER:  Here is what I would liken it to by way of

2    analogy.  It is the same situation as somebody that cooks crack

3    cocaine.  Someone can come in and be taught in a relatively short

4    period of time how to do it, that you mix the powdered cocaine with

5    water, that you --

6          THE COURT:  All right. I understand your position.  Let me

7    hear from the Government.

8          MR. NEAL:  This is not a skill possessed by members of the

9    general public. And the best evidence of that is the fact that Mr.

10   Dagnesses was able to command a thousand dollars per vial of blood,

11   roughly, at three clinics.

12         If this was something fraudulent physicians or clinic

13   owners could have done so easily they would have done it themselves.

14   However, they were willing to pay Mr. Dagnesses a fairly high sum to

15   do this.

16         THE COURT:  Was your client paid these fairly significant

17   fees?

18         MR. SCHUMACHER:  Judge, initially at Midway and at times at

19   T&R he was paid these fees. However, he was kicked out of that job

20   because -- for example, Jackie the lady that came in and replaced

21   him, she was doing it for $500.

22         I would submit to you there was evidence from the T&R case,

23   which was actually a State Court case that was investigated and

24   prosecuted by FDLE, that suggested in that case Mr. Dagnesses was

25   being paid $300. So the issue here is what is the special skill that

1    the general public could not be taught --

2          THE COURT:  It's not what they could be taught.  I assume

3    someone with a certain amount of intelligence could be taught with

4    training.  I don't think that is the standard.  In this case your

5    client was a doctor.  You obviously do not have to be a doctor but

6    you have to have some specialized training.

7          MR. SCHUMACHER:  I am not hearing any objection from the

8    Government as to what it took in order to manipulate the samples.

9    When the guidelines talk about a sophisticated skill I don't think

10    they are envisioning a situation where someone is taught in a very

11    short period of time, put this blood in a centrifuge, spin it,

12    syphon off the lightest stuff that comes to the top, which is the

13    platelets, and then submit the matter for testing.

14          If the Government says that's not what he did or that's not

15    factually accurate then I can understand. But that is what happened.

16    Therefore, if you look at those facts that's not a sophisticated

17    skill.

18          THE COURT:  All right.  I am going to deny the objection. I

19    think this is a special skill as contemplated by the guidelines, and

20    also the Eleventh Circuit's decisions. This is not a technical skill

21    that is generally held by the public.  I think it's the result of

22    his special training.

23          As I said, doesn't have to be a doctor but it certainly has

24    to be someone that has some kind of training, whether formal or

25    informal.  I think that's reflected by the fact he was fairly well

```
 1    paid.  So I am going to overrule that objection.  Are there any
 2    other objections?
 3           MR. SCHUMACHER:  There was an objection as to the
 4    calculations done under the amount of loss.
 5           THE COURT:  Let's talk about that -- let me ask the
 6    Government, why is he held accountable for more than Nodarse or
 7    Carrazana?
 8           MR. NEAL: Your Honor, he worked not only at Midway, he
 9    worked at two other clinics.  He is being held accountable for the
10    loss at those two other clinics as well.  So the amount is fairly
11    high.
12           THE COURT:  All right.  Let me go back to Mr. Schumacher.
13           MR. SCHUMACHER:  Thank you, Your Honor.  The objection
14    comes from the fact Mr. Dagnesses, although we did not file an
15    objection based upon a withdrawal of the conspiracy, I think from a
16    reasonable foreseeability standpoint that still has to apply.
17           He is being held responsible basically for what happened at
18    the very start of this conspiracy, which predates his entry in
19    August of 2003, up until the end of the conspiracy.
20           So, he is being held accountable for not only what happened
21    after he stopped working at the three facilities but also what
22    happened before he even worked at the facilities.
23           There were absolutely no steps that were taken by the
24    Probation Office or the Government to say these are the time periods
25    he worked and they were separate --
```

1    THE COURT:  Are you saying that as matter of law he is not

2    responsible for when he joins a conspiracy after its in place and

3    generating these illegal revenues, he is not responsible?

4         MR. SCHUMACHER:  Yes, Judge, that's what I am saying.

5         MR. NEAL: Your Honor, one quick note.  He is only being

6    held accountable for losses from July of 2003 forward at all three

7    clinics. He is not being held responsible for losses before he

8    joined the conspiracy.

9         THE COURT:  If that's the case --

10        MR. SCHUMACHER:  Well, Judge, he stopped working --

11        THE COURT:  Let me ask you, do you agree that is the

12   calculation for his entry --

13        MR. SCHUMACHER:  I believe that all of the calculation

14   figures that I received as part of discovery in this case, which

15   happen to coincide with the numbers that I then found in the PSI

16   were -- everything dated from June 2003.  I actually have the CD --

17        THE COURT:  Probation is kind of sitting over there shaking

18   his head that it was July when he joined. Does it make any

19   difference whether it was July or June as to the amount of loss

20   because of the breakoff points?

21        MR. NEAL:  The calculation we used was July. It would be

22   higher if we used June.

23        THE COURT:  How it could be higher if it was June?

24        MR. NEAL: July forward is the amount of loss we used. June

25   presumably would have more loss for that year.

1      THE COURT:  The defendant says he joined in July. That's

2  the date you used, right?

3      MR. SCHUMACHER:  August of 2003, Judge.

4      THE COURT:  What's August of 2003?

5      MR. SCHUMACHER:  When Mr. Dagnesses first began working at

6  the three clinics.

7      THE COURT:  Now you are shifting on me --

8      MR. SCHUMACHER:  I may not have been clear.  I apologize.

9      THE COURT:  What is the evidence with regard to his

10  beginning work there?

11      MR. NEAL:  Beginning in July, I have those numbers

12  calculated, beginning in July the total amount was $26,866,605.

13  Eighty percent of that would be $21,493,284.

14      We have reason to believe factually that he actually began

15  his work at Midway in at least July, possibly earlier. We are

16  conservative in estimating July 2003 forward and calculating his

17  loss.

18      THE COURT:  What is the basis for saying he was there

19  beginning in August?

20      MR. SCHUMACHER:  Outside of communication by my client

21  nothing. I have made the objection.  The burden then shifts to the

22  Government to prove --

23      THE COURT:  Yes. But you stand up and say July, and you say

24  July, July, July. Then all of a sudden the Government points out we

25  started in July, then you say it's not July it's August.

```
1              MR. SCHUMACHER:  I apologize if I misspoke. It's August of

2    2003. It does have a bearing. Obviously he is very close to the

3    $20,000,000 number. And in many of these instances, at least as far

4    as T&R, I have discovery --

5              THE COURT:  I am looking at paragraph 27.  Based on

6    Dagnesses' employment at Midway between approximately July 2003 to

7    mid 2004 and his employment at two other clinics, Diagnostic and

8    T&R, he is responsible for 26,000,0000, etcetera. That wasn't

9    objected to, was it?

10             MR. SCHUMACHER:  It was.

11             THE COURT:  The start date was objected to?

12             MR. SCHUMACHER:  Yes. That paragraph was objected to as

13   part of -- I just need to get a copy of my objections.

14             THE COURT:  I have it right here.

15             MR. SCHUMACHER:  My objection number four objected to

16   paragraphs 20, 27, 34 and 39 as to the amount of calculated loss,

17   which included the provision that the Court is now asking me about.

18             THE COURT:  You say in there he left Midway no later than

19   February 2004. Where do you object to the statement that he began

20   July of 2003?

21             MR. SCHUMACHER:  I agree there's not a specific objection

22   as to the date that it is begun.  If Your Honor would allow me to

23   interlineate that omission I will make it at this point in time --

24             THE COURT:  It's not all that clear. All right. What

25   evidence do you have Mr. Neal, that it was before?
```

1      MR. NEAL: I will be happy to put the agent on. I can

2  proffer it as well.

3      THE COURT:  Okay.

4      MR. NEAL: T&R's first submission to Medicare was in July of

5  2003. Dagnesses was sent to T&R by the owner of Midway, Marcia

6  Garcia, to help get started as a blood tainter at the clinic.

7      So he had to be working at Midway before July 14th of 03

8  since the only blood tainter at T&R, according to witnesses we have

9  spoken to, was Alexis Dagnesses.

10      The first claim submitted to Medicare at T&R was July

11  fourteenth, 2003.  Dagnesses was sent from Midway to T&R by the

12  owner of Midway. He plainly had been working at Midway for some

13  period of time before that, at least two weeks.

14      So in calculating his loss we started July first 2003 and

15  went forward.

16      THE COURT:  What's the factual basis for this analysis?

17      MR. NEAL: I am happy to put the agent on --

18      THE COURT:  Well, is it based on what a cooperating witness

19  said --

20      MR. NEAL: Absolutely.

21      THE COURT:  Or in documents, obviously because you have the

22  application of T&R.

23      MR. NEAL: It was based on a cooperating witness who told us

24  I told the owner of T&R about Dagnesses and sent him over there so

25  they could start the scheme at T&R. And that scheme started July

1   fourteenth 2003.

2          MR. SCHUMACHER:  I would ask for permission to call the

3   agent --

4          THE COURT:  Okay.  We're going to set this aside and go on

5   to someone else.  We may have to come back for your client. I wish

6   you had mentioned this in your papers.  This is the first I

7   understood that this was the basis of your claim.

8          All right.  Let's go with Mr. Garrido. Mr. Garrido is way

9   down at 23, criminal history one. Starts off with an advisory

10  guideline range of 46 to 57.

11         MR. CASSIDY:  That's the initial on the PSR, yes.

12         THE COURT:  He does have some criminal history. With the

13  same ruling I made with risk of serious bodily injury that would

14  take him down to 21.

15         MR. CASSIDY:  One other thing I wanted to add, Your Honor.

16  The factual proffer of my client did not contain the allegations of

17  administering, but since you have already granted that I don't want

18  to push it any further.

19         THE COURT:  All right.  But we're down to 21. Doesn't

20  matter how we get there --

21         MR. CASSIDY:  I don't care how we get there, Judge.

22         THE COURT:  All right. He is down to 21 and that equates to

23  37 to 46.

24         MR. CASSIDY: Yes, Judge.

25         THE COURT:  Any other objections?

```
1          MR. CASSIDY:  Just some minor tweaks on the PSI.

2          THE COURT:  Okay.  59 you say he was acquitted rather than

3   dismissal of the charges.

4          MR. CASSIDY:  Yes, Judge.

5          THE COURT:  That does not affect the guidelines or his

6   sentencing. Paragraphs eight and nine you have an objection with

7   reference to a related case, Judge Seitz.  That does not affect him

8   here at all.

9          MR. CASSIDY:  Yes, Judge.  It's just unusual to have that

10  in the PSR, but it does not affect the sentence, Your Honor.

11         THE COURT:  And it does not affect me either.  That is a

12  whole different defendant. 61 again as to his criminal history.  You

13  object as to how the domestic dispute was described.  The

14  disposition here says unknown. You said it was no action'd. I guess

15  no one can contest that.

16         MR. FELASCO:  No, Your Honor. It was not available.

17         THE COURT:  Will you make that correction then.

18         MR. FELASCO:  Yes.

19         THE COURT:  Does that take care of it?

20         MR. CASSIDY:  I believe it takes care of our objections.

21         THE COURT:  Because of the large amount of restitution

22  obviously no one can pay a fine. So I don't need to deal with that.

23         All right.  Let's go back to the issue of when Mr.

24  Dagnesses started with this conspiracy.

25         MR. NEAL:  Very well, Your Honor. United States calls Agent
```

1  Manuel Hernandez to the stand.

2  Thereupon,

3                    MANUEL HERNANDEZ,

4  having been first duly sworn or affirmed, was examined and testified

5  as follows:

6  BY MR. NEAL:

7  Q.    Agent, please state your name for the record.

8  A.    Manual Hernandez.

9  Q.    Where do you work?

10 A.    U.S. Department of Health and Human Services Office of Inspector

11  General.

12 Q.    Your job title is special agent?

13 A.    It is.

14 Q.    Your primary responsibilities include investigating allegations

15  of Medicare fraud?

16 A.    Yes, sir.

17 Q.    In the course of your work have you undertaken an investigation

18  into an entity called Midway Medical?

19 A.    Yes.

20 Q.    And have you also undertaken an investigation into an entity

21  called T&R Rehabilitation Center?

22 A.    Yes, sir.

23 Q.    Is there any connection between Midway and T&R that you are

24  aware of?

25 A.    There is.

1  Q.   What is that?

2  A.   The owner of Midway Marcia Garcia had a relationship with the

3   owners of T&R Rehabilitation in that she indicated to them how to

4   perform the fraud.

5  Q.   You know this from interviewing Marcia Garcia?

6  A.   Yes.

7  Q.   And you have interviewed Ms. Garcia on a number of occasions?

8  A.   Yes.

9  Q.   She had described her connections with the owners of T&R

10   Rehabilitation in the past?

11  A.   Yes.

12  Q.   And who are the owners of T&R Rehabilitation Center?

13  A.   Rolando Nogera, Tony Nogera and Modesto Del La Vega.

14  Q.   And Ms. Garcia knew these individuals how?

15  A.   She knew these individuals through a prior accident clinic that

16   they had where Modesto Del La Vega for her, and the Nogera Brothers,

17   ran a second accident clinic.

18  Q.   Did Alexis Dagnesses work for Marcia Garcia at Midway?

19  A.   Yes.

20  Q.   What was his job there?

21  A.   He manipulated patient blood samples.

22  Q.   Did Marcia Garcia have a conversation with any of the owners of

23   T&R about Alexis Dagnesses?

24  A.   Yes, sir.

25  Q.   What did that conversation consist of?

1  A.   How to design or orchestrate the fraud to include that you had

2   to manipulate the patients' blood samples to make it appear on paper

3   as if the patients needed the treatment, when in fact they did not.

4  Q.   How did Mr. Dagnesses come up in this conversation?

5  A.   In the reference to manipulating the patients' blood samples she

6   referred Alexis Dagnesses to Modesto Del La Vega as someone that

7   knew how to perform the skill.

8  Q.   When was the first claim submitted from T&R to the Medicare

9   program?

10  A.   Well, the first claim that would tie in to platelet counts or

11   deficiency in platelet counts was submitted in approximately July of

12   2003.

13  Q.   In fact it was July fourteenth, 2003?

14  A.   I believe so.

15        MR. SCHUMACHER:  Objection.

16        THE COURT:  Do you have something that would refresh his

17   recollection --

18        MR. NEAL:  Yes, Your Honor.

19        THE COURT:  Show it to counsel.

20  A.   July fourteenth.

21  Q.   Does that document refresh your recollection that claim was

22   submitted on or about the fourteenth of July of 2003?

23  A.   Yes, sir.  I prepared this.

24  Q.   Was there any other blood tainter at T&R?

25  A.   No, sir.

1    MR. NEAL: I have no further questions questions.

2    THE COURT:  Mr. Schumacher.

3  Q.   Agent, we're talking here simply about T&R; is that correct?

4  A.   No, sir, I  believe we're here because of Midway.

5  Q.   The conversations Mr. Neal just asked you about those related to

6  Mr. Dagnesses' participation at T&R; is that correct?

7  A.   No.  They related to the timeframe between Midway and T&R.

8  Q.   Okay.  It's your position that Mr. Dagnesses began his

9  manipulation of blood samples in -- was it June of 2003 then?

10 A.   What location?

11 Q.   T&R?

12 A.   T&R was approximately July of 2003, was the first claim that was

13  submitted, sir.

14 Q.   Did you participate in a joint investigation with FDLE in this

15  case?

16 A.   I did.

17 Q.   Specifically with special agent in charge Agent Rodriguez?

18 A.   He is my boss.

19 Q.   Did you and Agent Rodriguez go out and speak to people?

20 A.   I don't recall.  That was quite a long time ago.

21 Q.   Did you have information that as far as HIV infusion therapy it

22  started at a time different than what you testified to in court here

23  today?

24 A.   No, sir.  What I testified to was that the actual code that is

25  related to the platelet counts which would be the 287.3  as

1    designated on that chart, which is the diagnosis that is used to

2    describe a diagnosis known as thrombocytopenia, which would be low

3    platelet count, the first time that claim was submitted using that

4    code for which you would manipulate blood samples was in July of

5    2003.

6              However, the HIV started before that, just the part where

7    you would actually have to manipulate blood samples, the first claim

8    was submitted in July of 2003.

9    Q.   I am going to hand you a document.  Can you identify that

10   document?  Have you ever seen it before?

11   A.   I have.

12   Q.   What is that document, sir?

13   A.   This is a report of interview conducted at the search warrant of

14   T&R.

15   Q.   You were present for that?

16   A.   Yes, sir.

17   Q.   You are noted as being one of the individuals that were present

18   at the very top of the report?

19   A.   Yes.  I was in and out, sir.

20   Q.   Along with your boss, the same individual we previously

21   identified?

22   A.   Correct.

23   Q.   I would like turn your attention -- first of all, T&R opened in

24   1998?

25   A.   Yes, as an accident clinic.

1  Q.   I would like to call your attention to page three of the

2  document under the guise of infusion therapy.  We're talking about

3  HIV infusion therapy in that particular portion of it?

4  A.   That's correct.

5  Q.   The report indicates something different than what you have

6  testified to as far as when HIV infusion therapy began; does it not,

7  sir?

8  A.   No, sir. What it is, is this report is an interview that was

9  conducted during an ongoing investigation of the owner of the

10 clinic.  And we asked him when they began doing HIV, and he stated

11 to us it was sometime between September and October of 2003, which

12 is what you have circled.

13         But later where it says that Nogera asserts that there

14 should not be any claims submitted to Medicare prior to July of

15 2003, that was because we confronted him with billing data that

16 showed in fact there were claims submitted for HIV on or before July

17 of 2003.

18 Q.   But the money maker in this case, the way the conspiracy was

19 ongoing in this case, was through the infusion therapy, correct,

20 that was the big ticket item?

21 A.   Infusion therapy was generally -- there were various big ticket

22 items, if you will, within that infusion therapy.

23 Q.   Can we agree there is at least some information as far as the

24 HIV therapy, at least according to the owner of the clinic, it was

25 occurring in October of 2003 not June?

1   A.    No, I could not agree to that.  I know that not to be true. The

2   Medicare data submitted by the clinic shows on paper that the claims

3   for HIV were well in advance of September or October of 2003.

4            MR. SCHUMACHER:  I have no more cross on this issue. There

5   is one additional issue that would bear on the issue of amount of

6   loss if I could with this agent.

7            THE COURT:  Okay.

8   Q.    I would like to call your attention -- well, were you aware

9   there came a point in time when Mr. Dagnesses was no longer the

10  manipulator of blood?  Let's start with Midway.

11  A.    Yes.

12  Q.    Can we agree that was sometime roughly in February of 2004?

13  A.    I don't recall, sir. I know Jackie replaced him at Midway. I

14  don't recall the timeframe.

15  Q.    So she came in not only at Midway but some of the other clinics

16  as well?

17  A.    From interviewing Marcia Garcia what she told me is Jackie was

18  an employee at Midway and she told Jackie to learn from Alexis

19  Dagnesses how to manipulate the blood samples so she could take over

20  and fill in that role once Alexis Dagnesses was no longer there.

21  Q.    Specifically was no longer there because Jackie was going to do

22  it cheaper?

23  A.    I believe she ended up doing it cheaper. I don't know if that

24  was the conversation.  I know it was at Marcia Garcia's direction

25  for Jackie to learn from Alexis how to do this particular skill.

1 Q.   Going back to my original question.  I asked you whether or not

2 you knew he had also stopped working at, let's saying Diagnostic,

3 about that same time?

4 A.   I believe he stopped working at Diagnostic. I am not sure as

5 well on the timeframe.

6 Q.   And, again, that was because Jackie had taken over the blood

7 manipulation at both locations?

8 A.   I know she had taken over at Midway. I don't know if it was

9 particularly at Diagnostic as well.

10 Q.   What about T&R?  These are the same people, they had the same

11 relationships.  She's being used at T&R as well?

12 A.   No, sir. What I have been told by other individuals who are

13 cooperating in the T&R investigation, aside from Marcia Garcia, is

14 the one and only blood tainter from day one until the day T&R

15 stopped was Alexis.

16 Q.   And the total amount you have calculated, based upon Medicare

17 data for T&R, is the ten million dollar figure we talked about

18 previously?

19 A.   The amount that is reflected in the Medicare data for T&R is

20 roughly ten million dollars.  It's the same amount on the chart Mr.

21 Neal previously showed me.

22 Q.   And if I said that the amount submitted was $10,162,875 does

23 that sound about right to you?

24 A.   That's correct, sir.

25 Q.   From that figure we would have to -- that is what was billed.

1    It would be twenty percent based upon the calculations the

2    Government has used in this case?

3    A.    As far as loss.

4    Q.    Have you done anything in terms of preparation of the loss

5    figures in this case to take into consideration any time period

6    where Mr. Dagnesses was either not working at Midway and Diagnostic?

7    A.    Yes, sir. If you notice where it says on the from date column on

8    that sheet they all start in July.

9         The evidence we have is that Mr. Dagnesses started at

10   Midway prior to July. But we could not get an exact timeframe. But

11   we knew for sure he was at T&R from the first day they started

12   submitting for the 287.3

13        So when I look at the Medicare data the first day they

14   submit for the 287.3 diagnosis is July 14, 2003. So although he was

15   at Midway prior to July of 2003 we simply start at July of 2003 for

16   Midway as well because we know for sure through corroborating with

17   the Medicare data that July he was at T&R, which Marcia Garcia

18   introduced him to.

19        THE COURT:  How long do you plan to go with this?  I am

20   going to sentence the other defendants. We will have to come back

21   later on to complete this. I was not informed we would have to put

22   on evidence. Finish with your questions and then we will have to

23   come back on your client.

24   Q.    Sir, can we agree as far as Mr. Dagnesses the chart that has

25   been provided includes calculations for Diagnostic and T&R for

1    periods you now claim he was not working at those locations?

2         THE COURT:  Let me ask you, is it your position Mr.

3    Dagnesses should not be held accountable for losses after he was no

4    longer engaged because they brought someone else in to do the

5    testing -- or the tainting.

6         MR. SCHUMACHER:  Not specifically.  I think it's a

7    consideration under the 3553 factors this Court can consider. I am

8    not simply opposing it as to the objection as to the loss.

9         THE COURT:  You acknowledge then he did not withdraw?

10         MR. SCHUMACHER:  Yes, Your Honor, under this evidence --

11         THE COURT:  Finish your questions then.

12   Q.   Sir, the time periods we're talking about for Diagnostic and

13   T&R -- excuse me, for Midway and Diagnostic, those are for July 2003

14   until May 2005 or June 2005?  Isn't that what the chart says?

15   A.   Yes.

16   Q.   Some of those periods of time Mr. Dagnesses was not working at

17   those two locations spinning blood, can we agree to that?

18   A.   Yes.

19   Q.   As we sit here today you don't know when he stopped working at

20   those two locations?

21   A.   That's fair.

22         MR. SCHUMACHER:  Nothing further.  I would ask to be able

23   to move this into evidence.

24         MR. NEAL: No objection.

25         THE COURT:  Any further questions?

1        MR. NEAL: Nothing from the Government.

2        THE COURT:  All right.  I am overruling the objection based

3    on the testimony I have heard.  It's obvious to the Court, and I so

4    find, that because of the arrangement whereby Miss Garcia

5    recommended Mr. Dagnesses to T&R to do the same type of work he was

6    doing at Miss Garcia's facility and that the first claim was

7    submitted by T&R that required the tainting of the blood, that is

8    the work Mr. Dagnesses was doing, that he was working at --

9    obviously working at Ms. Garcia's facility prior to that time and

10   therefore his employment began no later than July 2003. So I am

11   overruling the objection and the loss calculation.

12       All right.  Is there anything else anyone needs to offer?

13   Hearing nothing from defense.

14       MR. NEAL  I believe you covered all the objections, from

15   the Government's perspective.

16       THE COURT:  Let's start with Mr. Nodarse.  Does Mr. Nordase

17   wish to say anything at this time?

18       DEFENDANT NODARSE:  I know that I committed a very serious

19   mistake. I am very sorry for what I did.  I ask forgiveness from the

20   United States because they gave me the opportunity to be here in

21   this country, and I betrayed that opportunity. I apologize to my

22   family as well.  Thank you.

23       THE COURT:  What is the Government's position?

24       MR. NEAL: We feel a guideline sentence would be

25   appropriate, the low end of the guidelines.

1          MR. KAFKA:  That's what I would ask, that Your Honor

2     sentence my client to the low end of the guidelines. Your Honor

3     knows this case very well, the participants in this case and the

4     fact my client was a medical assistant.

5          There were clinic owners, there were doctors involved. He

6     is, in my humble opinion, a participant that should be given the

7     opportunity of being sentenced at the low end of the guideline

8     range.

9          Also, the fact he is a U.S. citizen, he is married, he has

10     a fifteen year old.  The fact he has no prior criminal history.  I

11     think the Court should also take into consideration.

12          And immediately upon his arrest we contacted the Government

13     and informed the Government of his wish to cooperate with the

14     Government. That's of course saving time and expense for not only

15     the Government but this Court. I would ask the Court to follow that

16     recommendation.  Thank you.

17          THE COURT:  I have considered the statements of the

18     parties, as well as the presentence report.  I am adopting the

19     findings of facts and conclusions with the exception of those

20     objections that I sustained.

21          I have considered the advisory guidelines, the statutory

22     factors set forth in 3553. I am going to impose a sentence within

23     the advisory guideline range.

24          Based upon the very substantial forfeiture it appears the

25     defendant is unable to pay a fine therefore no fine is going to be

1    imposed.  It is the judgment of the Court that Defendant Gonzalo

2    Nodarse is committed to the Bureau of Prisons to be imprisoned for a

3    term of 78 months as to Count 1. It is further ordered he shall pay

4    restitution in the amount of $5,114,063 jointly and severally with

5    the codefendants in this case and if there are other codefendants in

6    other cases.

7            MR. NEAL:  Your Honor, there are. At this point we would

8    ask the figure of $3,687,893 be joint and several, the remaining

9    portion --

10           THE COURT:  Okay.  It will be that amount, the 3.6 amount,

11   jointly and severally with his codefendants in this case and the

12   other cases.

13           During his period of incarceration payment shall be made as

14   follows:  If the defendant earns wages in the UNICOR Job Program he

15   will pay 50 percent of the wages so earned. If he is not so employed

16   he shall pay a minimum of $25 per quarter.

17           Upon release from incarceration he shall pay restitution at

18   the rate of fifteen percent of his monthly gross earnings or until

19   such time the Court shall alter, in the interest of justice, the

20   payment schedule.

21           United States Bureau of Prisons, U.S. Attorney's Office,

22   United States Probation are all responsible for the enforcement of

23   this part of the order. These payments do not preclude the

24   Government from collecting any anticipated or unanticipated income,

25   assets, financial gains that he may come into in order to satisfy

1    his restitution obligation.  The restitution shall be made payable

2    to the Clerk of Courts, United States Clerk's Office:  Attention

3    Financial Section, 400 North Miami Avenue, Room 8N09, Miami, Florida

4    33128.

5         Restitution shall be forwarded by the Clerk to the Centers

6    for Medicare and Medicaid Services.  Upon release from imprisonment

7    Mr. Nordase shall be placed on supervised release for a term of

8    three years as to Count 1.

9         Within 72 hours of release from imprisonment defendant

10   shall report in person to the probation office in the district to

11   which he is released.

12        While on supervised release defendant shall not commit any

13   federal, state or local crimes, is prohibited from possessing a

14   firearm or other dangerous device, shall not possess any controlled

15   substance and shall comply with the standard conditions which have

16   been adopted by this Court with the following special conditions:

17        He shall cooperate with the collection of his DNA sample.

18   He shall comply with the financial disclosure requirement, the

19   employment requirement, relinquishment of licensure and health care

20   business restriction, all as described and noted in part G of the

21   presentence report.

22        And for each of his three years of supervised release he

23   shall perform community service as follows:  If he is not fully

24   employed he shall perform 1200 hours community service.  If he is

25   fully employed he shall perform 500 hundred hours community service

1    per year. Finally, he shall pay a special assessment of $100 which

2    is due and payable immediately. Therefore the total sentence is 78

3    months in prison, restitution in the amount of $3,687,893. That

4    amount is joint and several with the other codefendants.

5           I misspoke.  The restitution will be the $5,114,063, part

6    of which, as I indicated earlier, 3.6 plus million is to be jointly

7    and severally obligated.

8           Three years supervised release with the terms I have just

9    outlined and a $100 special assessment. Of course forfeiture of

10   right, title and interest in the property that is the subject of the

11   plea agreement.

12          I will ask the Government to provide me with an order of

13   forfeiture, which I will make that order a part of the judgment.

14          Was there a waiver?

15          MR. NEAL:  Yes, Your Honor.

16          THE COURT:  Mr. Nodarse to the extent -- first of all, do

17   counsel or Mr. Nodarse object to the Court's findings of fact or to

18   the manner in which sentence was pronounced here this morning?

19          MR. KAFKA:  Other than the objections that were previously

20   made, no, Your Honor.

21          THE COURT:  Mr. Nodarse, to the extent you have not waived

22   your right to appeal, pursuant to your plea agreement, you would

23   have the right to appeal.  If you decide you want to appeal you must

24   file that notice of appeal within ten days after the entry of

25   judgment against you.  If you are unable to pay the cost of the

1    appeal the Government will pay for that appeal.  Do you understand

2    you have that right?

3              THE DEFENDANT:  Yes, Your Honor

4              MR. NEAL:  Your Honor, briefly on Mr. Nodarse.  For the

5    reasons the Government articulated in its filing with you we would

6    ask Mr. Nodarse be given a surrender date in September 2009.

7              THE COURT:  First Monday after Labor Day.  I assume you

8    want a recommendation here in South Florida?

9              MR. KAFKA:  Yes, Your Honor.

10             THE COURT:  I will make a recommendation he be housed in a

11   facility as close to South Florida as is appropriate and available.

12             MR. KAFKA:  And the date of surrender, Your Honor?

13             THE COURT:  September 14th, 2009 for his surrender date.

14             MR. KAFKA:  Thank you, Your Honor.

15             THE COURT:  We next go to Mr. Garrido.  We have an advisory

16   guideline range of 37 to 46 months.  Let me hear from the Government

17   first.

18             MR. NEAL:  We are content with the calculations of the

19   advisory guidelines, and feel the Court is fully aware of the facts

20   and circumstances in the case.

21             THE COURT:  What is defendant's view?

22             MR. CASSIDY:  We're asking for 37 months --

23             THE COURT:  So the low end of the guidelines.  Does Mr.

24   Garrido wish to say anything at this time?

25             MR. CASSIDY:  Mr. Garrido asked I tell the Court how sorry

1    he is for the offenses that occurred.

2           THE COURT:  Anything else?

3           MR. NEAL: Not from the Government.

4           THE COURT:  I have considered the statements of the

5    parties, as well as the presentence report.  I am adopting the

6    findings of facts and conclusions with the exception of the two

7    level reduction. I have considered the advisory guidelines, as well

8    as the statutory factors set forth in 3553. I feel a sentence at the

9    low end of the guidelines is appropriate.

10          It also appears, based on his obligation for restitution,

11   Mr. Garrido is unable to pay a fine therefore no fine will be

12   imposed.

13          It is the judgment of the Court that defendant Carlos

14   Garrido is committed to the Bureau of Prisons to be imprisoned for a

15   term of 37 months as to Count 1. It is further ordered he shall pay

16   restitution in the amount of $747,433 jointly and severally with his

17   codefendants.

18          During his period of incarceration payment shall be made as

19   follows:  If the defendant earns wages in the UNICOR Job Program he

20   will pay 50 percent of the wages so earned. If he is not so employed

21   he shall pay a minimum of $25 per quarter.

22          Upon release from incarceration he shall pay restitution at

23   the rate of fifteen percent of his monthly gross earnings or until

24   such time the Court shall alter, in the interest of justice, the

25   payment schedule.

1    United States Bureau of Prisons, U.S. Attorney's Office,

2    United States Probation are all responsible for the enforcement of

3    this part of the order.

4    These payments do not preclude the Government from

5    collecting any anticipated or unanticipated income, assets,

6    financial gains that he may come into in order to satisfy his

7    restitution obligation.

8    The restitution shall be made payable to the Clerk of

9    Courts, United States Clerk's Office:  Attention Financial Section,

10   400 North Miami Avenue, Room 8N09, Miami, Florida 33128.

11   Restitution shall be forwarded by the Clerk to the Centers

12   for Medicare and Medicaid Services.

13   Upon release from imprisonment Mr. Garrido shall be placed

14   on supervised release for a term of three years as to Count 1.

15   Within 72 hours of release from imprisonment defendant

16   shall report in person to the probation office in the district to

17   which he is released.

18   While on supervised release defendant shall not commit any

19   federal, state or local crimes, is prohibited from possessing a

20   firearm or other dangerous device, shall not possess any controlled

21   substance and shall comply with the standard conditions which have

22   been adopted by this Court with the following special conditions:

23   He shall cooperate with the collection of his DNA sample.

24   He shall comply with the financial disclosure requirement, the

25   employment requirement, relinquishment of licensure and health care

1   business restriction, all as described and noted in part G of the

2   presentence report. And for each of his three years of supervised

3   release he shall perform community service as follows:  If he is not

4   fully employed he shall perform 1200 hours community service.  If he

5   is fully employed he shall perform 500 hundred hours community

6   service per year.

7          Finally, he shall pay a special assessment of $100 which is

8   due and payable immediately. Therefore the total sentence is 37

9   months in prison, restitution in the amount of $747,433.

10          Also ordering forfeiture of right, title and interest in

11   the property that is the subject of the plea agreement. I will ask

12   the Government to provide me with an order, which I will make that

13   order a part of the judgment.

14          Now that sentence has been imposed does defendant or

15   counsel object to the Court's findings of fact or the manner in

16   which sentence has been pronounced?

17          MR. CASSIDY:  It was not an objection. My client does have

18   a history of alcohol --

19          THE COURT:  Do you have any objection first?

20          MR. CASSIDY:  No objection.

21          THE COURT:  What else?

22          MR. CASSIDY:  He has an alcohol problem, as indicated in

23   the PSI.  I would ask he be allowed to have an evaluation when he

24   is --

25          THE COURT:  I will make a recommendation he be submitted to

1  a substance abuse program.

2  MR. CASSIDY:  We would ask given his health and the

3  programs available we would ask if you could recommend Coleman --

4  THE COURT:  I never recommend a specific institution. I

5  will recommend they take into consideration his health concerns and

6  recommend a place as close to South Florida as is appropriate and

7  available.

8  To the extent you have not waived your right to appeal

9  pursuant to your plea agreement you would have the right to appeal.

10  If you decide you want to appeal you must file that notice of appeal

11  within ten days after the entry of judgment against you.

12  If you are unable to pay the cost of the appeal the

13  Government will pay for that appeal.  Do you understand you have

14  that right?

15  THE DEFENDANT:  Yes, Your Honor.

16  THE COURT:  Anything further?

17  MR. NEAL: Your Honor, the Government would ask the

18  defendant be remanded at this time.

19  MR. CASSIDY:  Your Honor, we would ask he be allowed to

20  surrender.

21  THE COURT:  I am going to remand him at this time.

22  Next we go to Defendant Carrazana.  We're at 27, criminal

23  history one. That gives us an advisory guideline range of 70 to 87.

24  MS. PUGLISI:  Yes, Your Honor.

25  THE COURT:  What is the Government's recommendation?

1          MR. NEAL:  Government's recommendation would be the

2    defendant be sentenced to the low end of the guideline range.

3          THE COURT:  Does your client want to say something?

4          MS. PUGLISI:  Yes.

5          DEFENDANT CARRAZANA:  May I read something?

6          THE COURT:  Certainly.

7          THE DEFENDANT:  I am asking forgiveness from you, from the

8    Government, from the audience, from God, from my friends. To

9    everyone who in one way or the other I could have harmed.

10         I know that I made a mistake, but we are all humans, we all

11   make mistakes.  God knows how repentant I am. He has seen my

12   suffering throughout this process.

13         I began to work at the place which I am being tried now. At

14   that time I thought it was a good job. After the passage of time I

15   found out what was going on. But I never thought about how great the

16   damage which could be inflicted on me would be.

17         I allowed certain things to happen because of my wish to

18   maintain my job, and that is the reason I am here today. I complied

19   with illegal orders which I should have never obeyed.

20         I should have left the place or to act in an adequate

21   manner before the law. I did that, in fact, I left.  I withdrew but

22   it was too late.  I was always very afraid.

23         But we cannot go back to the past.  I only have left to ask

24   forgiveness, again from God, and from you all. Ask you to give me a

25   second opportunity.

1        I am not a bad person.  I never wanted to harm society.  I

2  always prepared myself for life. I have been a professional man. I

3  have always had a good behavior in society.  What I am sure of is

4  this will never again happen to me.

5        Thanks be to God because of what has happened I have

6  approached God even more. My life will be before and after because

7  these things will seal me during my whole life.

8        I am also concerned about my parents who are in Cuba, very

9  ill and very elderly. I do not know when I will be able to see them

10  again. But only God knows the reason why things happen. Thank you

11  for giving me this opportunity to release my soul and thoughts to

12  you.

13        THE COURT:  I asked counsel to remind me -- you want to do

14  that now?

15        MS. PUGLISI:  Yes, Your Honor.  I would be asking for a

16  departure in this case. I did put on a few of reasons. I would like

17  to add a few things. The one thing you did ask me to remind you

18  about is that he left the job in March 2004.

19        He left it to be unemployed.  So he chose to forego a

20  stable paycheck in order to stop working for or being involved in

21  this conspiracy.

22        Regarding his history and characteristics, I will stand by

23  the letters which I filed with the Court.

24        Judge, I believe the need to pay restitution -- I think

25  Your Honor should take that into consideration as well. There is a

1    large amount of money to pay. We would argue it would be more

2    beneficial to do less time in incarceration and more time on

3    supervised release so that he can be out in society getting a job

4    and paying back the restitution he needs to be paying.

5         Additionally, I wanted to speak to you about the

6    sophisticated means. Obviously the case law says it's based on the

7    conspiracy not any individual person, and that is why the Court gave

8    the additional two points.

9         I do want to point out a few things. What made this

10   conspiracy sophisticated is not something that had to do with Mr.

11   Carrazana.

12        First of all, he had nothing to do with the money

13   laundering activities. He had nothing to do with the blood thinning,

14   which was used to fraudulently bill Medicare.

15        And he also had nothing to do with the secret cash payments

16   the Government spoke about in their response. So for those reasons I

17   would ask you to take into consideration his particular role in this

18   case.

19        One of the factors Your Honor can consider is whether

20   defendants are similarly situated. I would submit to the Court that

21   they are not similarly situated in this case based upon Mr.

22   Carrazana's actions. Mr. Carrazana was never charged with any money

23   laundering activities.

24        In the PSI they speak to Del Cueto, Rodriguez, Garrido and

25   Nodarse. There were large amounts of money that were taken. It is an

```
 1   important fact that 3.6 million dollars approximately was received
 2   from the fraudulent billing, of which Mr. Carrazana did not receive
 3   any of that. He was merely an employee --
 4            THE COURT:  Well, he is not being held accountable for the
 5   money laundering.
 6            MS. PUGLISI:  I would just ask the Court to take that into
 7   consideration when fashioning a sentence to show that their actions
 8   are not similarly situated to Mr. Carrazana's.
 9            THE COURT:  Okay.
10            MS. PUGLISI:  He does have family and friends here for him
11   today --
12            THE COURT:  Yes. I received a number of letters from family
13   and friends.
14            MS. PUGLISI:  That's why I am not going to read those
15   letters because I know Your Honor did.
16            THE COURT:  I want to make some comments about those
17   letters before we finish up.
18            Let me hear from the Government.
19            MR. NEAL:  Your Honor, we would oppose any motion for
20   downward departure. It is true Mr. Carrazana did leave his
21   employment at Midway, but it was not after three weeks or three
22   months, it was after a year and a half of working there.
23            If you look at the nature and circumstances of the offense,
24   he was injecting patients over and over with medications he knew
25   they did not need and falsifying medical records.  Under those
```

1    circumstances we think a downward departure would be inappropriate.

2         THE COURT:  I agree.  I don't think a downward departure is

3    appropriate. He has gotten the benefit of a two level reduction from

4    what could have been, from a fair reading of what was done here, the

5    risk of death or serious harm.  As I said, I gave every defendant

6    that benefit.

7         I also said I would take into consideration the fact they

8    would inject people with this medication or the chemicals -- not the

9    chemicals but the modified blood.

10        I think that is a factor that should be considered. It

11   shows a total disregard for everyone else other than themselves.

12   This was a major Medicare fraud case. I think his role was a very

13   significant role.

14        I can't help but point out in his recitation of what

15   happened here just a moment ago, if I heard him correctly he was

16   talking about this punishment being inflicted on him.

17        He should understood this is not being inflicted on him, he

18   inflicted it on himself. This was a conscious decision. This is not

19   an emotional decision where this was a one time thing.

20        Every day he went to work, every day he injected these

21   people with this tainted -- this medication. Unlike what he is

22   trying to tell the Court now, I do not consider him to be a victim.

23   The victims are those people that got those injections.

24        He said he never wanted to harm society.  He obviously

25   wanted to harm society because of his activities over a year and a

1    half where he stole money from a very important Medicare program. I

2    suspect some of the people sitting in the audience are recipients of

3    Medicare or certainly if they are not personally recipients then

4    their friends and relatives are.

5            This is a crime against those people. In reading these

6    letters where they say the defendants have made a mistake and

7    they're good and honorable people, these are not honest people that

8    steal millions and millions of dollars from the Medicare system.

9    Because they are stealing it from you and your friends and family

10   that need those programs.

11           You asked for the Court's forgiveness.  That's not my job.

12   That's for a higher authority than I. I am here to apply what I

13   think is a reasonable sentence in this case.

14           I have considered the statements of the parties, as well as

15   the presentence report.  I am adopting the findings of facts and

16   conclusions with the exception of the two level reduction.

17           I have considered the advisory guidelines, as well as the

18   statutory factors set forth in 3553. I believe a sentence within the

19   guideline range is appropriate.

20           It appears based upon his obligation to pay restitution Mr.

21   Carrazana is unable to pay a fine therefore no fine will be imposed.

22           It is the judgment of the Court that defendant Alexis

23   Carrazana is committed to the Bureau of Prisons to be imprisoned for

24   a term of 72 months as to Count 1. It is further ordered he shall

25   pay restitution in the amount of $3,687,893 jointly and severally

1   with his codefendants in this case.  During his period of

2   incarceration payment shall be made as follows:  If the defendant

3   earns wages in the UNICOR Job Program he will pay 50 percent of the

4   wages so earned. If he is not so employed he shall pay a minimum of

5   $25 per quarter.

6        Upon release from incarceration he shall pay restitution at

7   the rate of fifteen percent of his monthly gross earnings or until

8   such time the Court shall alter, in the interest of justice, the

9   payment schedule.

10        United States Bureau of Prisons, U.S. Attorney's Office,

11   United States Probation are all responsible for the enforcement of

12   this part of the order.

13        These payments do not preclude the Government from

14   collecting any anticipated or unanticipated income, assets,

15   financial gains that he may come into in order to satisfy his

16   restitution obligation.

17        The restitution shall be made payable to the Clerk of

18   Courts, United States Clerk's Office:  Attention Financial Section,

19   400 North Miami Avenue, Room 8N09, Miami, Florida 33128.

20        Restitution shall be forwarded by the Clerk to the Centers

21   for Medicare and Medicaid Services.  Upon release from imprisonment

22   Mr. Carrazana shall be placed on supervised release for a term of

23   three years as to Count 1.

24        Within 72 hours of release from imprisonment defendant

25   shall report in person to the probation office in the district to

```
1   which he is released.   While on supervised release defendant shall
2   not commit any federal, state or local crimes, is prohibited from
3   possessing a firearm or other dangerous device, shall not possess
4   any controlled substance and shall comply with the standard
5   conditions which have been adopted by this Court with the following
6   special conditions:
7           He shall cooperate with the collection of his DNA sample.
8   He shall comply with the financial disclosure requirement, the
9   employment requirement, relinquishment of licensure and health care
10  business restriction, all as described and noted in part G of the
11  presentence report.
12          And for each of his three years of supervised release he
13  shall perform community service as follows:  If he is not fully
14  employed he shall perform 1200 hours community service.  If he is
15  fully employed he shall perform 500 hundred hours community service
16  per year. To be performed on an annualized basis, which means they
17  cannot be carried over from year to year.
18          Finally, he shall pay a special assessment of $100 which is
19  due and payable immediately. Therefore the total sentence is 72
20  months in prison, restitution in the amount of $3,687,893.
21          Now that sentence has been imposed does defendant or
22  counsel object to the Court's findings of fact or the manner in
23  which sentence has been pronounced?
24          MS. PUGLISI:  Yes, Your Honor.
25          THE COURT:  Any other than the ones we have previously
```

1   talked about?

2          MS. PUGLISI:  No, Judge. We will rely on the previous

3   arguments made.

4          THE COURT:  Pursuant to Rule 32(c)(5) of the Rules of

5   Criminal Procedure, you have the right to appeal the sentence

6   imposed.  Any notice of appeal must be filed within ten days of the

7   entry of judgment being entered in this case.  If you are unable to

8   pay the cost of the appeal the Government will pay for that appeal.

9   Do you understand you have that right?

10          THE DEFENDANT:  Yes, Your Honor

11          THE COURT:  I assume you want a recommendation for South

12   Florida incarceration as well?

13          MS. PUGLISI:  Yes, Your Honor.  We would ask if he could

14   have a surrender date --

15          MR. NEAL:  We would oppose that request.

16          THE COURT:  He will be remanded today as well.

17          MR. NEAL: One further issue.  With respect to forfeiture we

18   would ask forfeiture in the amount of money judgment equivalent to

19   the amount of restitution be entered and we will submit an order to

20   that effect.

21          THE COURT:  All right.  Finally we have Mr. Dagnesses.

22   He's at level 29, 87 to 108 months in prison.  Let me hear from the

23   Government.

24          MR. NEAL: We have nothing to say other than what was

25   articulated in the memorandum. We would recommend a sentence within

1    the advisory guideline range.

2         THE COURT:  That's a pretty broad range.  It's 87 to 108.

3         MR. NEAL: We would recommend the middle of the guideline

4    range.

5         THE COURT:  Does Mr. Dagnesses wish to say anything?

6         MR. SCHUMACHER:  He asked me to relate to the Court he

7    appreciates his wife being present to support him. He has indicated

8    he is very embarrassed by his actions and reiterates his acceptance

9    of responsibility. I do have some comments.

10        THE COURT:  All right.

11        MR. SCHUMACHER:  Obviously one of the 3553 factors that is

12   involved in any case is the disparity of sentences between

13   individuals similarly situated in connection with an offense.

14        What the PSI does not indicate is that there were some

15   additional individuals that were charged in the T&R case in State

16   Court. People that were mentioned by the agent in this case.  People

17   they relied upon for information.

18        Specifically Miss Diaz.  There was a sentence imposed of

19   four years Probation for her. Mr. De La Vega who was actually the

20   medical director at T&R who received a sentence of 366 days and four

21   years of probation.

22        Also Mr. Tapanas, who was instrumental in the T&R factor.

23   He was also given a sentence of 366 days and five years probation.

24        Specifically as relates to Mr. Dagnesses, as the Court is

25   aware based on the amount of loss we objected to, he is actually

1   being held accountable for the most senior person indicated in the

2   PSI, that is Dr. Rodriguez. I would point out Dr. Rodriguez was

3   actually held accountable, according to paragraph 25, for his

4   involvement in five separate facilities, including the use of his

5   number and so forth. In that case Dr. Rodriguez actually shared in a

6   portion of the profits from the money laundering and so forth.

7         We're not saying that Mr. Dagnesses didn't perform an

8   instrumental task in connection with the conspiracy. What I would

9   ask the Court to consider is that a good portion of the fact was

10  outside the time where he was no longer functioning at the two

11  facilities.

12        He is certainly responsible for those three facilities

13  because he did participate. He is really very close on the cusp to

14  the $20,000,000 figure.  According to the figures related in

15  paragraph 27 of the PSI he is at $21,493,000.

16        That is including all of that time period the agent was

17  candid about that he doesn't exactly know where -- he was not really

18  performing these day to day activities on behalf of the conspiracy.

19  I think that's something the Court should take into consideration

20  particularly since -- -

21        THE COURT:  I agree. I am convinced I should take that into

22  consideration.

23        MR. SCHUMACHER:  He was not sharing in the profits.  Those

24  well above him in the food chain were so doing. But for the fact he

25  did not get a role enhancement, he got everything else.  With the

1    exception of the reduction by Your Honor for the two points.    As

2    it relates to whether or not the sentence is sufficient I think 87

3    months is more than sufficient.

4         I think perhaps too high given all things and, again, the

5    way the other codefendants in this case were functioning on a day to

6    day basis, day after day.

7         And of course he was financially benefiting. I am not

8    saying that.  But I think he is just scoring too high. But for the

9    fact he chose not to enter into a plea agreement that's the reason

10   why he is at that level.

11        THE COURT:  Mr. Neal.

12        MR. NEAL: Your Honor, we think a sentence in the middle of

13   the guideline range is appropriate. The conduct Mr. Dagnesses

14   participated in was egregious. He tainted blood not for just one

15   clinic but for three.

16        Again, the reason the loss figure is so high is Mr.

17   Dagnesses' fault. He chose to perform his misconduct at three

18   clinics.  We certainly think a mid range sentence would be the

19   appropriate place for the Court to come out.

20        THE COURT:  I have considered the statements of the

21   parties, the presentence report which contains the advisory

22   guidelines, as well as the 3553 statutory factors.

23        Based on the amount of restitution it is apparent Mr.

24   Dagnesses cannot pay a fine therefore no fine will be required.

25

1       It is the judgment of the Court that defendant Alexis

2   Dagnesses is committed to the Bureau of Prisons to be imprisoned for

3   a term of 90 months as to Count 1.

4       It is further ordered he shall pay restitution in the

5   amount of $12,464,499 jointly and severally with his codefendants in

6   this case.  During his period of incarceration payment shall be made

7   as follows:  If the defendant earns wages in the UNICOR Job Program

8   he will pay 50 percent of the wages so earned. If he is not so

9   employed he shall pay a minimum of $25 per quarter.

10      Upon release from incarceration he shall pay restitution at

11  the rate of fifteen percent of his monthly gross earnings or until

12  such time the Court shall alter, in the interest of justice, the

13  payment schedule.

14      United States Bureau of Prisons, U.S. Attorney's Office,

15  United States Probation are all responsible for the enforcement of

16  this part of the order.

17      These payments do not preclude the Government from

18  collecting any anticipated or unanticipated income, assets,

19  financial gains that he may come into in order to satisfy his

20  restitution obligation.

21      The restitution shall be made payable to the Clerk of

22  Courts, United States Clerk's Office:  Attention Financial Section,

23  400 North Miami Avenue, Room 8N09, Miami, Florida 33128.

24  Restitution shall be forwarded by the Clerk to the Centers for

25  Medicare and Medicaid Services.  Upon release from imprisonment Mr.

1    Dagnesses shall be placed on supervised release for a term of three

2    years as to Count 1.  Within 72 hours of release from imprisonment

3    defendant shall report in person to the probation office in the

4    district to which he is released.

5          While on supervised release defendant shall not commit any

6    federal, state or local crimes, is prohibited from possessing a

7    firearm or other dangerous device, shall not possess any controlled

8    substance and shall comply with the standard conditions which have

9    been adopted by this Court with the following special conditions:

10         He shall cooperate with the collection of his DNA sample.

11   And he shall cooperate with Immigration with regard to any removal

12   proceedings.

13         He shall comply with the financial disclosure requirement,

14   the employment requirement, relinquishment of licensure and health

15   care business restriction, all as described and noted in part G of

16   the presentence report.

17         And for each of his three years of supervised release he

18   shall perform community service as follows:  If he is not fully

19   employed he shall perform 1200 hours community service.  If he is

20   fully employed he shall perform 500 hundred hours community service

21   per year. To be performed on an annualized basis, which means they

22   cannot be carried over from one year to the next.

23         Finally, he shall pay a special assessment of $100 which is

24   due and payable immediately. Therefore the total sentence is 90

25   months in prison, restitution in the amount of $12,464,499.

1    Now that sentence has been imposed does defendant or

2  counsel object to the Court's findings of fact or the manner in

3  which sentence has been pronounced?

4    MR. SCHUMACHER:  We would reiterate our previous

5  objections.

6    THE COURT:  Pursuant to Rule 32(c)(5) of the Rules of

7  Criminal Procedure, you have the right to appeal the sentence

8  imposed.  Any notice of appeal must be filed within ten days of the

9  entry of judgment being entered in this case.  If you are unable to

10  pay the cost of the appeal the Government will pay for that appeal.

11  Do you understand you have that right?

12    THE DEFENDANT:  Yes, Your Honor

13    THE COURT:  Would you like a recommendation for South

14  Florida incarceration as well?

15    MR. SCHUMACHER:  Yes, Your Honor.

16    THE COURT:  I will make that recommendation

17    MR. NEAL  the Government will file an order of forfeiture

18  equivalent to the restitution amount. In terms of the restitution

19  amount the 3.6 million would be joint and several so it would be the

20  3,000,000 -- the amount indicated previously.

21    THE COURT:  The three million six hundred some odd thousand

22  will be joint and several.

23    MR. NEAl:  Yes, Your Honor.

24    THE COURT:  Anything further?

25    MR. NEAL:  With respect to Mr. Nodarse and Mr. Garrido, the

1   money laundering counts are dismissed.  So with respect to Mr.

2   Nodarse it would be Counts 12 through 14 of the indictment. With

3   respect to Mr. Garrido I believe it would be Counts 9 through 11.

4          THE COURT:  All those counts will be dismissed. Anything

5   further we need to take up this morning?

6          MR. NEAL:  I'm sorry, Your Honor, Count 2 would be

7   dismissed as well as to those two defendants.  Count 2 was as to the

8   money laundering conspiracy.

9          THE COURT: They'll be dismissed. Thank you all.

10                      SENTENCING CONCLUDED

11                          -  -  -

12                   C E R T I F I C A T E

13      I hereby certify that the foregoing is an accurate

14   transcription of proceedings in the above-entitled matter.

15

16                              /S/PATRICIA SANDERS

17   _____              _____

18   DATE FILED              PATRICIA SANDERS, RPR

19

20

21

22

23

24

25