1

```
 1                 UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF FLORIDA

 3                  CASE NO. 09-20138-CR-HUCK

 4   UNITED STATES OF AMERICA

 5        vs.

 6   ROBERTO RODRIGUEZ

 7   CARLOS GARRIDO

 8   ALEXIS CARRAZANA

 9   GONZALO NODARSE,

10             Defendants

11                 PLEAS HELD 3-23-09

12           BEFORE THE HONORABLE PAUL C. HUCK

13               UNITED STATES DISTRICT COURT

14   APPEARANCES:

15   FOR THE GOVERNMENT:      JOHN NEAL,

16                           ASSISTANT UNITED STATES ATTORNEY

17   FOR DEFENDANTS:          LOUIS MARTINEZ, ESQUIRE

18                           BERNARD CASSIDY, ESQUIRE

19                           SABRINA PUGLISI, ESQUIRE

20                           CARL KAFKA, ESQUIRE

21   REPORTED BY:             PATRICIA SANDERS, RPR

22                           Official Court Reporter

23

24

25
```

1        THE COURT:  Please be seated. We're here in United States

2   versus Rodriguez and others.

3        MR. NEAL:  Good afternoon John Neal on behalf of the United

4   States.

5        MR. KAFKA:  Carl Kafka on behalf of Carlos Garrido.

6        MR. CASSIDY: Bernard Cassidy on behalf of Carlos Garrido.

7        MS. PUGLISI:  Good afternoon. Sabrina Puglisi, Assistant

8   Federal Defender, on behalf of Mr. Alexis Carrazana who is present

9   and using the aid of a Spanish interpreter.

10       MR. MARTINEZ:  Good afternoon.  Louis Martinez on behalf of

11  Dr. Roberto Rodriguez who is before the Court.

12       THE COURT:  It's my understanding we're here for changes of

13  pleas. There are apparently three plea agreements and one person

14  without a plea agreement.

15       I would like to take all of the pleas together. Anyone have

16  a problem with that?

17       MR. NEAL:  No objection from the Government.

18       MR. KAFKA:  No objection, Your Honor.

19       MR. CASSIDY:  No objection.

20       MS. PUGLISI:  No objection.

21       MR. MARTINEZ: No objection.

22       THE COURT:  In order to make it easier for everyone,

23  including the court reporter, I would like to have the defendants

24  line up behind the podium with their lawyers to their side, and I

25  would like to have it the way they're listed in the indictment. I

1  have Carrazana, Garrido, Nodarse and Rodriguez.  I will start first

2  with Mr. Carrazana and go in the order I just listed.

3          Please swear in the defendants please

4                  DEFENDANTS SWORN

5          THE COURT:  Starting with Mr. Carrazana, please tell us

6  your full name.

7          THE DEFENDANT: Alexis Carrazana.

8          THE COURT: Mr. Carrazana, do you understand you are under

9  oath, and I will be asking you some questions that you must answer

10  truthfully?  If you answer them falsely your false answer could

11  later be used against you in a criminal prosecution. Do you

12  understand that?

13          THE DEFENDANT: Yes, Your Honor.

14          THE COURT: Tell us how old you are and where you were born.

15          THE DEFENDANT: I was born in Cuba. I am 41 years old.

16          THE COURT:  And of what country are you a citizen?

17          THE DEFENDANT: I am Cuban.

18          THE COURT: How far did you go in school?

19          THE DEFENDANT: I finished university.

20          THE COURT: Have you ever been treated for mental illness,

21  drug addiction or alcoholism of any kind?

22          THE DEFENDANT: Never.

23          THE COURT: Are you currently under the influence of any

24  medications, drugs, narcotics, alcohol or any similar substance?

25          THE DEFENDANT: No, sir.

1        THE COURT: Have you taken or consumed any of those

2   substances in the past 24 hours?

3        THE DEFENDANT: No, sir.

4        THE COURT: Ms. Puglisi, do you have an opinion whether your

5   client is fully competent and capable of entering an informed and

6   voluntary guilty plea this afternoon?

7        MS. PUGLISI:  Yes, Your Honor, I believe he is competent to

8   proceed.

9        THE COURT:  Mr. Garrido, please tell us your full name.

10       THE DEFENDANT: Carlos Garrido.

11       THE COURT: Mr. Garrido, do you understand you are now under

12  oath, and I will be asking you some questions that you must answer

13  truthfully, and if you answer them falsely your false answer could

14  later be used against you in a criminal prosecution. Do you

15  understand that?

16       THE DEFENDANT: Yes, Your Honor.

17       THE COURT: Tell us how old you are and where you were born.

18       THE DEFENDANT: I was born in Cuba, and I am 69 years old.

19       THE COURT:  And of what country are you a citizen?

20       THE DEFENDANT: United States.

21       THE COURT: How far did you go in school?

22       THE DEFENDANT: I am a doctor. I graduated in Madrid, Spain.

23       THE COURT: Have you ever been treated for mental illness,

24  drug addiction or alcoholism of any kind?

25       THE DEFENDANT: Never.

1      THE COURT: Are you currently under the influence of any

2  medications, drugs, narcotics, alcohol or any similar substance?

3      THE DEFENDANT: No, sir. But I do take medication for high

4  blood pressure, for my prostate and for diabetes.

5      THE COURT: Are they causing you any problems in terms of

6  whether you can understand what the proceedings are all about this

7  afternoon?

8      THE DEFENDANT:  No, sir.

9      THE COURT: Other than those medications you have indicated

10 have you taken any other drugs or medication in the past 24 hours?

11     THE DEFENDANT: No, sir.

12     THE COURT: Mr. Cassidy, do you have an opinion whether your

13 client is fully competent and capable of entering an informed and

14 voluntary guilty plea?

15     MR. CASSIDY:  Yes.  And I believe he is competent to

16 proceed with his plea of guilty.

17     THE COURT: Mr. Nodarse, please tell us your full name.

18     THE DEFENDANT: Gonzalo Nodarse.

19     THE COURT:  Sir, do you understand you are under oath, that

20 I will be asking you questions that you must answer truthfully, and

21 if you answer them falsely your false answer could later be used

22 against you in a criminal prosecution?  Do you understand that?

23     THE DEFENDANT: Yes, Your Honor.

24     THE COURT: Tell us how old you are and where you were born.

25     THE DEFENDANT: I was born in Cuba, and I am 38 years old.

1      THE COURT: And how far did you go in school?

2      THE DEFENDANT: I studied medicine, went to medical school

3  in Cuba.

4      THE COURT: Have you ever been treated for mental illness,

5  drug addiction or alcoholism of any kind?

6      THE DEFENDANT: Never.

7      THE COURT: Are you currently under the influence of any

8  medications, drugs, narcotics, alcohol or any similar substance?

9      THE DEFENDANT: No, sir.

10      THE COURT: Have you taken or consumed any of those

11  substances in the past 24 hours?

12      THE DEFENDANT: No, sir.

13      THE COURT: Mr. Kafka, do you have an opinion whether your

14  client is fully competent and capable of entering an informed and

15  voluntary guilty plea this afternoon?

16      MR. KAFKA:  Yes, Your Honor, I believe my client is

17  competent and capable of entering a plea here today.

18      THE COURT:  And Mr. Rodriguez, do you understand you are

19  under oath, that I will be asking you questions that you must answer

20  truthfully and if you answer them falsely your false answer could

21  later be used against you in a criminal prosecution or for perjury?

22  Do you understand that?

23      THE DEFENDANT: Yes, Your Honor.

24      THE COURT: Tell us how old you are and where you were born.

25      THE DEFENDANT: I was born in Havana, Cuba and I am 54

1    years.

2          THE COURT:  And of what country are you a citizen?

3          THE DEFENDANT: U.S.

4          THE COURT: How far did you go in school?

5          THE DEFENDANT:  University, School of Medicine.

6          THE COURT: Have you ever been treated for mental illness,

7    drug addiction or alcoholism of any kind?

8          THE DEFENDANT: Never.

9          THE COURT: Are you currently under the influence of any

10   medications, drugs, narcotics, alcohol or any similar substance?

11         THE DEFENDANT: No, sir.

12         THE COURT: Have you taken or consumed any of those

13   substances in the past 24 hours?

14         THE DEFENDANT: No, sir.

15         THE COURT: Mr. Martinez, do you have an opinion whether

16   your client is fully competent and capable of entering an informed

17   and voluntary guilty plea this afternoon?

18         MR. MARTINEZ:  Based upon my conversation with my client I

19   believe he is fully competent to change his plea here today.

20         THE COURT: Now, I am going to ask the questions to all the

21   defendants as a group but each defendant must answer individually

22   and out loud. I am going to ask the answers be given in the order

23   you are standing, starting with Mr. Carrazana and ending with Mr.

24   Rodriguez.  And if you don't understand any of my questions please

25   let me know.

1          First of all, have each of you received a copy of the

2   indictment pending against you, that is the formal written charges

3   the Government has brought against you in this case?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE DEFENDANT:  Yes, Your Honor.

6          THE DEFENDANT:  Yes, Your Honor.

7          THE DEFENDANT:  Yes.

8          THE COURT:  Have each of you discussed those charges and

9   the case in general and any potential defenses you might have in

10  defending against those charges with your attorney?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE DEFENDANT:  Yes, Your Honor.

13         THE DEFENDANT:  Yes, Your Honor.

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT: Are each of you fully satisfied with the advice

16  your attorney has given to you in this case?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE DEFENDANT:  Yes, Your Honor.

19         THE DEFENDANT:  Yes, Your Honor

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT: Is there anything about any of your attorney's

22  representation of you in this case that you are not completely

23  satisfied with?

24         THE DEFENDANT:  No, Your Honor.

25         THE DEFENDANT:  No, Your Honor.

9

```
1          THE DEFENDANT:  No, Your Honor

2          THE DEFENDANT:  No, Your Honor.

3          THE COURT:  Now the next question I want to ask of Mr.

4   Garrido, Mr. Nodarse and Mr. Rodriguez. Is your willingness to plead

5   guilty as a result of discussions your lawyers have had with the

6   Government which discussions have resulted in your signed plea

7   agreement?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE DEFENDANT:  Yes, Your Honor.

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT: Now, Count 1, and this is as to all four of the

12   defendants, Count 1 of the indictment charges each of you with

13   conspiracy to commit healthcare fraud, that in violation of 18

14   United States Code Section 1349.

15          Do each of you understand the nature of that charge as set

16   forth in Count 1?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE DEFENDANT:  Yes, Your Honor.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT: Count 2 of the indictment charges defendants

22   Garrido, Nodarse and Rodriguez with willfully and knowingly

23   conspiring to launder money, that in violation of 18 United States

24   Code Section 1956(h). Do each of those three defendants understand

25   the nature of that charge?
```

1        THE DEFENDANT:  Yes, Your Honor.

2        THE DEFENDANT:  Yes, Your Honor.

3        THE DEFENDANT:  Yes, Your Honor.

4        THE COURT: Counts 6 through 14 of the indictment each

5    charge various defendants, that is Mr. Rodriguez in Counts 6, 7 and

6    8, Mr. Garrido in Counts 9, 10 and 11 and Mr. Nodarse in Counts 12,

7    13 and 14, with violating 18 United States Code Section 1957 by

8    knowingly engaging in and attempting to engage in monetary

9    transactions involving criminally derived property with a value

10   greater than $10,000 and that such property was derived from

11   specified unlawful activity as described in the indictment.

12        Mr. Garrido, Mr. Nodarse and Mr. Rodriguez, do you

13   understand the nature of those charges brought against you as set

14   forth more fully in the indictment?

15       THE DEFENDANT:  Yes, Your Honor.

16       THE DEFENDANT:  Yes, Your Honor.

17       THE DEFENDANT:  Yes, Your Honor.

18       THE COURT: It's my understanding each of you have agreed to

19   plead guilty to Count 1.  Before you do so I want you to understand

20   what the Government would have prove to a jury beyond a reasonable

21   doubt in order for you to be found guilty of the crime charged in

22   Count 1 if this case had gone to trial.

23       The Government would have to prove the following beyond a

24   reasonable doubt.  From in or about September 2002 continuing

25   through in or about June 2005 you came to a mutual understanding or

1  agreement with at least one other person to execute or attempt to

2  execute a scheme or artifice to defraud the Medicare system or to

3  obtain by means of fraudulent or false pretenses, false

4  representations or false promises, money or property of the Medicare

5  system.

6          And that each of you knowing the unlawful purpose of the

7  plan willfully joined in that plan. Do each of you understand the

8  Government would have to prove those facts in order for you to be

9  found guilty of the crime charged in Count 1.  ?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE DEFENDANT:  Yes, Your Honor.

12          THE DEFENDANT:  Yes, Your Honor.

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT: Now, with regard to the potential sentence and

15  penalties with regard to Count 1, it carries with it the following:

16  A maximum sentence of up to but not more than ten years

17  imprisonment, a term of supervised release of at least two years but

18  not more than three years, a maximum fine of up to $250,00 or twice

19  the gross gain or loss resulting from the criminal activity charged

20  in the indictment, restitution to the victim of the crime and a

21  mandatory special assessment of $100.

22          Do each of you understand I can impose a sentence within

23  those terms if you plead guilty to Count 1?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE DEFENDANT:  Yes, Your Honor.

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT: Now, have each of you discussed the Federal

 4    Sentencing Guidelines with your attorney?

 5              THE DEFENDANT:  Yes, Your Honor.

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE DEFENDANT:  Yes, Your Honor.

 9              THE COURT: Do you understand that those guidelines will

10    assign to you a numeric score based on the nature of the offense to

11    which you are pleading guilty and any criminal history you might

12    have and the Court will take into consideration those guidelines

13    together with other appropriate factors in determining what a fair

14    and reasonable sentence should be for you in this case?

15              THE DEFENDANT:  Yes, Your Honor.

16              THE DEFENDANT:  Yes, Your Honor.

17              THE DEFENDANT:  Yes, Your Honor.

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT: Do each of you also understand these guidelines

20    are not mandatory, which means I do not have to follow them, and

21    that may result in you receiving a sentence that might be higher or

22    lower than that recommended in the guidelines?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE DEFENDANT:  Yes, Your Honor.

25              THE DEFENDANT:  Yes, Your Honor.
```

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT: Do each you understand any estimate or opinion

3    given to you by your attorney or anyone else is merely that person's

4    opinion, which is not binding on the Court, it's the Court alone

5    which will determine what the appropriate sentence is after

6    reviewing what we call a presentence report and hearing from all the

7    parties?

8    THE DEFENDANT:  Yes, Your Honor.

9    THE DEFENDANT:  Yes, Your Honor.

10    THE DEFENDANT:  Yes, Your Honor.

11    THE DEFENDANT:  Yes, Your Honor.

12    THE COURT: Do you understand once the guilty plea is

13    accepted you will not be able to change the guilty plea solely as a

14    result of the sentence given you in this case?

15    THE DEFENDANT:  Yes, Your Honor.

16    THE DEFENDANT:  Yes, Your Honor.

17    THE DEFENDANT:  Yes, Your Honor.

18    THE DEFENDANT:  Yes, Your Honor.

19    THE COURT: Now I note that Mr. Garrido, Mr. Nordase and Mr.

20    Rodriguez have all expressly waived their right to appeal the

21    sentence pursuant to their written and signed plea agreements.

22    With respect to those three defendants I want to ask the

23    following questions:  Before you signed the plea agreement did each

24    of you thoroughly and carefully discuss with your attorney the fact

25    you had the right to appeal any sentence and that by signing the

1   plea agreement you are giving up right to appeal, both the direct

2   appeal or any collateral appeal?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE DEFENDANT:  Yes, Your Honor.

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT: Do any of you have any question or want to ask

7   the Court or your counsel anything about what it means to give up

8   your right to appeal?

9              THE DEFENDANT:  No, Your Honor.

10             THE DEFENDANT:  No, Your Honor.

11             THE DEFENDANT:  No, Your Honor.

12             THE COURT: I find that Defendants Garrido, Nodarse and

13  Rodriguez have all knowingly and voluntarily given up their right to

14  appeal pursuant to their written plea agreements.

15             Now, I want each of you to understand that even though you

16  have given up the right to appeal pursuant to the plea agreement

17  that under some circumstances each of you would have the right to

18  appeal.

19             For example, if the Government appeals or if I give you a

20  sentence greater than that recommended by the guidelines or give you

21  a sentence greater than that permitted by statute you would still

22  have the right to appeal. Do you understand that as well?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE DEFENDANT:  Yes, Your Honor.

25             THE DEFENDANT:  Yes, Your Honor

1        THE COURT: Mr. Carrazana, do you understand you have the

2    complete right to appeal if you are dissatisfied with your sentence?

3        THE DEFENDANT: Yes, sir.

4        THE COURT: Do all of you, each defendant, understand that

5    the Government if it's not satisfied with the sentence has the right

6    to appeal?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE DEFENDANT:  Yes, Your Honor.

9        THE DEFENDANT:  Yes, Your Honor.

10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT: Mr. Garrido, is that your signature on the plea

12    agreement?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT: Mr. Nodarse, is that your signature on your plea

15    agreement?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT: And Mr. Rodriguez, is that your signature?

18        THE DEFENDANT:  Yes, Your Honor.

19        THE COURT: Before each of you signed the plea agreement did

20    you carefully read it over and discuss it thoroughly with your

21    attorney?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE DEFENDANT:  Yes, Your Honor.

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT: And did your attorney answer to your

1   satisfaction any and all questions you might have had about your

2   plea agreement, what each term and condition of the plea agreement

3   means and how that agreement can affect your life?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE DEFENDANT:  Yes, Your Honor.

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT: When you signed that plea agreement, as you

8   stand here now, do each of you believe you have a full, fair and

9   complete understanding of exactly what the plea agreement means,

10  what each of the terms and conditions of the agreement mean and how

11  it can affect you?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE DEFENDANT:  Yes, Your Honor.

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT: Now, do each of you understand that any

16  recommendations being made pursuant to the plea agreement are merely

17  recommendations, I do not have to accept them, and as a result you

18  may receive a sentence that might be harsher or greater than you are

19  anticipating, and you still will not be able to change your guilty

20  plea.

21          Do each of you understand that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE DEFENDANT:  Yes, Your Honor.

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT: Do each of your signed plea agreements represent

```
1    the full, complete agreement you have with the Government in this

2    case?

3            MR. NEAL:  Your Honor, two of the defendants, Mr. Nodarse

4    and Mr. Rodriguez, have side letters referencing cooperation.

5            THE COURT:  With that understanding, do those plea

6    agreements represent the full agreement you have with the Government

7    in this case?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE DEFENDANT:  Yes, Your Honor.

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT: Other than what is contained in your plea

12   agreement has the Government or anyone else given you any promise,

13   assurance or anything else in an effort to get you to plead guilty?

14           THE DEFENDANT: No, Your Honor.

15           THE DEFENDANT: No, Your Honor.

16           THE DEFENDANT: No, Your Honor.

17           THE COURT: Mr. Carrazana, has anyone offered you anything

18   to induce you to plead guilty in this case?

19           THE DEFENDANT: No, Your Honor.

20           THE COURT: With regard to all the defendants, has anyone

21   attempted to force you, coerce or threaten you in any way to get you

22   to plead guilty.

23           THE DEFENDANT: No, Your Honor.

24           THE DEFENDANT: No, Your Honor.

25           THE DEFENDANT: No, Your Honor.
```

```
1              THE DEFENDANT:  No, Your Honor.

2              THE COURT: Do each of you understand the offense to which

3     you are pleading is a felony offense and if the plea is accepted you

4     will be adjudged guilty?  As a result you will lose some very

5     important rights.

6              You will lose your right to vote in an election, to hold

7     public office, to sit as a juror in a jury trial, the right to

8     possess a firearm or other dangerous device or weapon.

9              And if you are not a U.S. citizen it may also effect your

10    immigration status and your ability to remain in this country or to

11    return to this country.  Do you understand by pleading guilty you

12    will be giving up those very important rights?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE DEFENDANT:  Yes, Your Honor.

15             THE DEFENDANT:  Yes, Your Honor

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  The next question is very important, I want you

18    to think carefully about it.  Do each of you understand that you

19    have the complete right to plead not guilty to the charges and to

20    persist in that plea of not guilty?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE DEFENDANT:  Yes, Your Honor.

23             THE DEFENDANT:  Yes, Your Honor

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Do you also understand at that trial if you had
```

1    pled not guilty to the charges you would have the right to a trial

2    by jury in this very courtroom and at that trial you would have

3    certain rights?

4            First, you would be presumed innocent of all the charges.

5    It would be the Government's burden to prove your guilt beyond a

6    reasonable doubt.  You would also have the right to be represented

7    by counsel such as are here representing you today. You would have

8    the right to see and to hear and to cross examine all of the

9    Government witnesses who would be called to testify against you.

10           Also, if there were witnesses that could help you in your

11   defense you could compel them to be here at trial by the issuance of

12   subpoena or other compulsory process.

13           Also at that trial you would not have to testify but could

14   remain silent unless you decided it was in your best interest to

15   testify.  If you decided not to testify that silence could not be

16   used against you in any way and you would still be presumed

17   innocent.

18           Do you all understand by pleading guilty you will be giving

19   up the right to a trial by jury and all those rights that go with

20   that trial by jury I have just discussed?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE DEFENDANT:  Yes, Your Honor.

23           THE DEFENDANT:  Yes, Your Honor.

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT: With regard to the forfeiture. There's a

1   forfeiture claim with regard to all defendants; is that correct?

2           MR. NEAL:  That is correct.

3           THE COURT:  Now the Government has sought forfeiture of

4   certain assets in this case.  Do you understand you would have a

5   right to a trial by jury as well in the forfeiture matter?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE DEFENDANT:  Yes, Your Honor.

8           THE DEFENDANT:  Yes, Your Honor.

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And at the trial the Government would have the

11  burden to prove their right to forfeiture of those assets by a

12  preponderance of the evidence.

13          Do you understand by pleading guilty and giving up your

14  right to a trial by jury on the forfeiture issue that you are giving

15  up all right, title and interest to the assets that are the subject

16  of the Government's forfeiture claim?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE DEFENDANT:  Yes, Your Honor.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT: Now I am going to ask the Government to tell us

22  what it could have proven had this case gone to trial.  Please

23  listen carefully to what the Government says you did in this case.

24          Mr. Neal.

25          MR. NEAL:  Thank you, Your Honor.  First, with respect to

1  Mr. Carrazana.  If this case were to proceed to trial the United

2  States would prove the following facts beyond a reasonable doubt:

3          That beginning in approximately September 2000 and

4  continuing through approximately March 2004 the defendant Alexis

5  Carrazana willfully conspired with others to commit health care

6  fraud, in violation of 18 United States Code Section 1349.

7          Medicare is a healthcare benefit program of the United

8  States as defined in 18 United States Code Section 24.  Further,

9  Medicare is a healthcare benefit program affecting commerce.

10          Beginning in approximately September 2002 and continuing

11  through approximately March 2004 Mr. Carrazana worked as a medical

12  assistant at a clinic, a business known as Midway, located at 85

13  Grand Canal Drive, Suite 402, in Miami Florida.

14          Throughout its existence Midway purported to specialize in

15  providing services to patients with the Human Immunodeficiency Virus

16  or HIV.  At the beginning of his tenure at Midway Mr. Carrazana

17  worked closely with clinic owner Marcia Garcia and physician Carmen

18  Del Cueto.  Mr. Carrazana was aware that Garcia and Del Cueto billed

19  the Medicare program routinely for services that were medically

20  unnecessary and in many instances never provided.

21          Garcia and Del Cueto purchased only a small fraction of the

22  medication that was purportedly being administered to Midway

23  patients.  Garcia and Del Cueto also typically billed Medicare for

24  three injections or infusions of medication per week when the

25  patients generally only came to Midway once per week. Mr. Carrazana

1   would make entries in medical records indicating that he had

2   provided medication on particular dates and particular dosages to

3   patients when in fact he had not.

4       Most of the services allegedly provided to patients of

5   Midway were billed to the Medicare program as treatment for a

6   diagnosis of thrombocytopenia, a disorder involving low count of

7   platelets in the blood.

8       Mr. Carrazana had been told by his co-conspirators that

9   none of Midway patients actually had low blood platelet counts.  To

10  make it appear the patients actually had low platelet levels Garcia

11  and Del Cueto used chemists to manipulate the blood samples drawn

12  from Midway patients before the blood was sent to a lab for

13  analysis.

14      These chemists, who included Alexis Dagnesses, would

15  extract the platelets from the blood before the blood was tested by

16  the lab.  The resulting lab reports which would be placed in the

17  patient files would make it appear the patients had dangerously low

18  platelet levels and would theoretically support the medical

19  necessity of treatments supposedly being rendered at Midway.

20      Mr. Carrazana was fully aware of this practice during his

21  tenure at Midway and administered medication to patients knowing the

22  patients did not need the medication he was providing.

23      Del Cueto's Medicare provider number was suspended in late

24  2003 and Garcia retained another physician Roberto Rodriguez to work

25  at the clinic in exchange for a percentage of Medicare

1  reimbursements.  Mr. Carrazana continued to work at Midway as a

2  medical assistant through approximately March of 2004, and at the

3  direction of the physicians and others continued to falsify medical

4  records indicating that treatments were medically necessary and

5  actually provided when in fact they were not.

6          With respect to Carlos Garrido.  If this case were to

7  proceed to trial the United States would prove the following facts

8  beyond a reasonable doubt:

9          Beginning in approximately November 2004 and continuing

10  through approximately June 2005 the defendant Carlos Garrido

11  willfully conspired with others to commit health care fraud in

12  violation of 18 United States Code Section 1349.  Medicare is a

13  healthcare benefit program of the United States as defined in 18

14  United States Code Section 24.  Further, Medicare is a healthcare

15  benefit program affecting commerce.

16          Beginning in approximately November 2004 and continuing

17  through approximately June 2005 Garrido a Miami physician was a part

18  owner of and practicing physician at Midway Medical Center a medical

19  clinic located at 85 Grand Canal Drive, Suite 402, in Miami Florida.

20          Throughout its existence Midway purported to specialize in

21  providing services to patients with the Human Immunodeficiency Virus

22  or HIV.  In approximately November 2004 Garrido entered into an

23  agreement with Marcia Garcia the owner and operator of Midway.

24  Garrido agreed to use his personal Medicare provider number to

25  submit claims to the Medicare program for services he purportedly

1  provided and supervised at the clinic in exchange for the resulting

2  Medicare reimbursements. At the time Garrido entered this agreement

3  with Garcia Midway employed medical assistants, including Gonzalez

4  Nodarse, purportedly to provide injections and infusion therapy to

5  patients at the clinic.

6       Garrido and Garcia billed the Medicare program routinely

7  for services that were medically unnecessary and in many instances

8  never provided. Garrido and Garcia purchased only a small fraction

9  of the medication that was purportedly being administered to Midway

10 patients.

11      Garrido ordered the patients treated with medication he

12 knew the clinic did not have available to provide to the patients.

13 Garrido was fully aware many of the treatments he ordered and billed

14 to the Medicare program were never actually provided.

15      Most of the services Garrido allegedly provided to patients

16 at Midway were billed to the Medicare program as treatments for a

17 diagnosis of thrombocytopenia, a disorder involving a low count of

18 platelets in the blood. None of Midway's patients actually had low

19 blood platelet counts.

20      To make it appear the patients actually had low platelet

21 levels Garrido and Garcia used chemists to manipulate the blood

22 samples drawn from Midway patients before the blood was sent to a

23 lab for analysis.  These chemists, who included Alexis Dagnesses,

24 would extract the platelets from the blood before the blood was

25 tested by the lab.

1    The resulting lab reports which would be placed in the

2  patient files would make it appear the patients had dangerously low

3  platelet levels and would theoretically support the medical

4  necessity of treatments supposedly being rendered at Midway.

5    Garrido was well aware of this blood tainting practice and

6  nonetheless billed the Medicare program for medication that would

7  treat thrombocytopenia despite knowing the patients did not actually

8  have that condition.

9    From in or about November 2004 through in or about June

10  2005 Garrido and his co-conspirators caused approximately $1,182,367

11  in false and fraudulent claims to be submitted to the Medicare

12  program for services allegedly provided at Midway.  Medicare paid

13  approximately $747,433 on these claims.

14    With respect to Gonzalo Nodarse, if this case were to

15  proceed to trial the United States would prove the following facts

16  beyond a reasonable doubt:

17    Beginning in approximately September 2002 and continuing

18  through approximately June 2005 the defendant Gonzalo Nodarse

19  willfully conspired with others to commit health care fraud, in

20  violation of 18 United States Code Section 1349.

21    Medicare is a healthcare benefit program of the United

22  States as defined in 18 United States Code Section 24. Further,

23  Medicare is a healthcare benefit program affecting commerce.

24    Beginning in approximately September 2002 and continuing

25  through approximately June 2005 Nodarse worked as a medical

1   assistant at a clinic that did business as Midway Medical Center
2   located at 85 Grand Canal Drive, Suite 402, in Miami Florida.
3   Throughout its existence Midway purported to specialize in providing
4   services to patients with the Human Immunodeficiency Virus or HIV.
5        At the beginning of his tenure at Midway Nodarse worked
6   closely with clinic owner Marcia Garcia and physician Carmen Del
7   Cueto.  Nodarse was aware that Garcia and Del Cueto billed routinely
8   for services that were medically unnecessary and in many instances
9   never provided. Garcia and Del Cueto purchased only a small fraction
10  of the medication that was purportedly being administered to Midway
11  patients.  Garcia and Del Cueto also typically billed Medicare for
12  three injections or infusions per week when the patients generally
13  only came to Midway once per week.
14       Nodarse would make entries in medical records indicating he
15  had provided medication on particular dates and particular dosages
16  to patients when in fact he had not.
17       Most of the services allegedly provided to the patients at
18  Midway were billed to the Medicare program as treatments for a
19  diagnosis of thrombocytopenia, a disorder involving a low count of
20  platelets in the blood.
21       None of the Midway patients actually had low blood platelet
22  counts.  To make it appear the patients actually had low platelet
23  levels Garcia and Del Cueto used chemists to manipulate the blood
24  samples drawn from Midway patients before the blood was sent to a
25  lab for analysis.

1    These chemists, who included Alexis Dagnesses, would

2  extract the platelets from the blood before the blood was tested by

3  the lab.  The resulting lab reports which would be placed in the

4  patient files would make it appear the patients had dangerously low

5  platelet levels and would theoretically support the medical

6  necessity of treatments supposedly being rendered at Midway.

7    Nodarse was well aware of this practice during his tenure

8  at Midway and administered medications to patients knowing that the

9  patients did not need the medications he was allegedly providing.

10    During the time that he worked at Midway Nodarse also

11  worked with Del Cueto at Diagnostic Medical Center, another Miami

12  clinic that purported to specialize in treating patients with HIV.

13  As at Midway Nodarse was aware that Diagnostic did not have enough

14  medication on hand to cover the services that were billed to the

15  Medicare program.

16    He was also aware the patients' blood samples were tainted

17  to make it appear the patients had thrombocytopenia, a condition

18  they did not have.  As at Midway, Nodarse made entries in medical

19  records indicating he had provided medication on particular dates

20  and particular dosages when in fact he had not.

21    Del Cueto's Medicare provider number was suspended in late

22  2003 and Garcia retained another physician, Roberto Rodriguez, to

23  work at the clinic in exchange for a percentage of Medicare

24  reimbursements.

25

1        During Rodriguez's tenure at the clinic Nodarse continued

2   to work at the clinic as a medical assistant and continued to

3   falsify medical records indicating that treatments were medically

4   necessary and actually provided when, in fact, they were not.

5        In late 2004 Carlos Garrido, a third physician, came to

6   work at the clinic.  As with Del Cueto and Rodriguez, Nodarse

7   continued to falsify medical records for patients purportedly under

8   Garrido's care, indicating that treatments were medically necessary

9   and actually provided when in fact they were not.

10       From in on or about September 2002 through in or about June

11  2005 Nodarse and his co-conspirators caused approximately

12  $12,959,947 in false and fraudulent claims to be submitted to the

13  Medicare program for services allegedly provided at Midway and

14  Diagnostic.  Medicare actually paid $6,244,632.97 on these claims.

15       With respect to the Roberto Rodriguez, Your Honor, if this

16  case were to proceed to trial the United States would prove the

17  following facts beyond a reasonable doubt:

18       Beginning in approximately October 2003 and continuing

19  through approximately February 2005 the defendant Roberto Rodriguez

20  willfully conspired with others to commit health care fraud in

21  violation of 18 United States Code Section 1349.

22       Medicare is a healthcare benefit program of the United

23  States as defined in 18 United States Code Section 24. Further,

24  Medicare is a healthcare benefit program affecting commerce.

25

1        Beginning in approximately October 2003 and continuing

2   through approximately November 2004 Rodriguez, a Miami physician,

3   was a part owner and practicing physician at Midway Medical Center a

4   medical clinic located at 85 Grand Canal Drive, Suite 402, in Miami

5   Florida.

6        Throughout its existence Midway purported to specialize in

7   providing services to patients with the Human Immunodeficiency Virus

8   or HIV.

9        In approximately October 2003 Rodriguez entered into an

10  agreement with Marcia Garcia, the owner and operator of Midway.

11  Rodriguez agreed to use his personal Medicare provider number, along

12  with a group provider number belonging to the clinic, to submit

13  claims to the Medicare program for services he purportedly provided

14  and supervised at the clinic in exchange for a percentage of the

15  resulting Medicare reimbursements

16       Midway employed medical assistants, including Gonzalo

17  Nodarse and Alexis Carrazana, purportedly to provide injections and

18  infusion therapy to patients at the clinic.

19       Rodriguez and Garcia billed the Medicare program routinely

20  for services that were medically unnecessary and in many instances

21  never provided. Rodriguez and Garcia purchased only a small fraction

22  of the medication that was purportedly being administered to Midway

23  patients.

24       Most of the services allegedly provided to patients at

25  Midway were billed to the Medicare program as treatments for a

1  diagnosis of thrombocytopenia, a disorder involving a low count of

2  platelets in the blood. None of Midway patients actually had low

3  blood platelet counts.

4       To make it appear the patients actually had low platelet

5  levels Rodriguez and Garcia used chemists to manipulate the blood

6  samples drawn from Midway patients before the blood was sent to a

7  lab for analysis.

8       These chemists, who included Alexis Dagnesses, would

9  extract the platelets from the blood before the blood was tested by

10  the lab.  The resulting lab reports which would be placed in the

11  patient files would make it appear the patients had dangerously low

12  platelet levels and would theoretically support the medical

13       Necessity of treatments supposedly being rendered at

14  Midway. Rodriguez was well aware of this blood tainting practice and

15  nonetheless billed the Medicare program for medication that would

16  treat thrombocytopenia despite knowing the patients did not actually

17  have that condition.

18       Midway was not the only clinic where Rodriguez purported

19  to treat HIV patients with injection and infusion therapies.

20  Rodriguez was listed as a medical director and practicing physician

21  for five other infusion clinics between approximately October 2003

22  and approximately February 2005.

23       At these additional clinics Rodriguez conduct was

24  substantially similar to his conduct at Midway that he and his

25  co-conspirators billed the Medicare program for HIV injections and

1    infusion services that Rodriguez knew were medically unnecessary and

2    in some instances never actually provided them.  The names and

3    locations of the additional HIV clinics where Rodriguez engaged in

4    similarly fraudulent conduct are Roberto Rodriguez M.D., P A located

5    at 8000 West Flagler Street, Suites 206 and 207; Zodiac Enterprises,

6    Inc. Located at 7940 Southwest Eighth Street in Miami Florida; B and

7    F Medical Center, Inc. Located at 3383 Northwest 7th Street, Suite

8    212, Miami Florida; Medirehab Center, Inc. Located at 5600 Southwest

9    135th Avenue, Suite 106, Miami Florida  and Sunset Clinical Center,

10   Inc. Located at 7171 Coral Way, Suite 501 in Miami Florida.

11           From in or about October 2003 through in or about June 2005

12   Rodriguez and his co-conspirators caused the submission of over

13   $20,000,000 in false and fraudulent claims to the Medicare program

14   for services allegedly provided at Midway and the additional clinics

15   listed above.  Medicare actually paid at least 11,000,000 on these.

16   False and fraudulent claims.

17           Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. Neal.

19           Mr. Carrazana, did you hear what the Government said you

20   did in this case?

21           THE DEFENDANT:  Yes.

22           THE COURT:  And did you do what the Government said you

23   did?

24           THE DEFENDANT:  I would just like to add I did not taint

25   the blood, Your Honor.

1    THE COURT:  With that addition, did you do what the

2  Government said you did in this case?

3    THE DEFENDANT: Yes.

4    THE COURT: Then how do you plead to the charge set forth in

5  Count 1 of the indictment, guilty or not guilty?

6    THE DEFENDANT: Guilty.

7    THE COURT: It is the finding of the Court in this case that

8  Alexis Carrazana is fully competent and capable of entering an

9  informed and voluntary guilty plea, that he is aware of the nature

10  of the charge and the consequences of the guilty plea.

11    I find the guilty plea is a knowing and voluntary guilty

12  plea supported by an independent basis in fact containing each of

13  the essential elements necessary to prove the crime charged in Count

14  1 of the indictment.

15    Therefore, the guilty plea is accepted, Mr. Carrazana is

16  now adjudged guilty of the offense, and I am ordering a presentence

17  investigation report in the case.

18    Mr. Garrido, did you hear what the Government said you did

19  in this case?

20    THE DEFENDANT:  Yes.

21    THE COURT:  And did you do what the Government said you did

22  in this case?

23    THE DEFENDANT: Yes.

24    THE COURT: How do you plead to the charge set forth in

25  Count 1 of the indictment, guilty or not guilty?

1          THE DEFENDANT: Guilty.

2          THE COURT: It is the finding of the Court in this case that

3  Carlos Garrido is fully competent and capable of entering an

4  informed and voluntary guilty plea, that he is aware of the nature

5  of the charge and the consequences of the guilty plea.

6          I find the guilty plea is a knowing and voluntary guilty

7  plea supported by an independent basis in fact containing each of

8  the essential elements necessary to prove the crime charged in Count

9  1 of the indictment.

10         Therefore, the guilty plea is accepted, Mr. Garrido is now

11  adjudged guilty of the offense, and I am ordering a presentence

12  investigation report in his case as well.

13         THE COURT:  And, Mr. Nodarse, did you hear what the

14  Government said you did in this case?

15         THE DEFENDANT:  Yes.

16         THE COURT:  And did you do what the Government said you

17  did?

18         THE DEFENDANT: Yes.

19         THE COURT: How do you plead to the charge set forth in

20  Count 1 of the indictment, guilty or not guilty?

21         THE DEFENDANT: Guilty.

22         THE COURT: It is the finding of the Court in this case that

23  Gonzalo Nodarse is fully competent and capable of entering an

24  informed and voluntary guilty plea, that he is aware of the nature

25  of the charge and the consequences of the guilty plea.

1    I find the guilty plea is a knowing and voluntary guilty

2 plea supported by an independent basis in fact containing each of

3 the essential elements necessary to prove the crime charged in Count

4 1 of the indictment.

5    Therefore, the guilty plea is accepted, Mr. Nodarse is now

6 adjudged guilty of the offense, and I am ordering a presentence

7 investigation report.

8    Finally, Mr. Rodriguez, did you hear what the Government

9 said you did in this case?

10    THE DEFENDANT:  Yes.

11    THE COURT:  And did you do what the Government said you did

12 in this case?

13    THE DEFENDANT: Yes.

14    THE COURT:  How do you plead to the charge set forth in

15 Count 1 of the indictment, guilty or not guilty?

16    THE DEFENDANT: Guilty.

17    THE COURT: It is the finding of the Court in this case that

18 Roberto Rodriguez is fully competent and capable of entering an

19 informed and voluntary guilty plea, that he is aware of the nature

20 of the charge and the consequences of the guilty plea.

21    I find the guilty plea is a knowing and voluntary guilty

22 plea supported by an independent basis in fact containing each of

23 the essential elements necessary to prove the crime charged in Count

24 1 of the indictment.  His guilty plea is now accepted and Mr.

25 Rodriguez is now adjudged guilty.  I am ordering a presentence

1    investigation report in this matter as well.  I am tentatively

2    setting sentencing for all defendants on June first at 12:30.  I may

3    have to move that date.  Ms. Williams will send out the notices.  I

4    have a few more defendants that will be pleading later on this week

5    and I would like, if at all possible, to schedule them for the same

6    date.  All right.  Thank you all. I will see you sometime in June.

7                            -   -   -

8                    C E R T I F I C A T E

9          I hereby certify that the foregoing is an accurate

10   transcription of proceedings in the above-entitled matter.

11

12                                    /S/PATRICIA SANDERS

13   _____                    _____

14   DATE FILED                    PATRICIA SANDERS, RPR

15

16

17

18

19

20

21

22

23

24

25